

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| JOHN DOE G, JOHN DOE I, and JOHN DOE H, as individuals and on behalf of others similarly situated, | ) ) ) ) | No. 74354-6-I |
| Respondents, | ) ) ) | (Consolidated with No. 74355-4-I) |
| v. | ) ) | DIVISION ONE |
| DEPARTMENT OF CORRECTIONS, STATE OF WASHINGTON, | ) ) ) | PUBLISHED OPINION |
| Appellant, | ) ) ) | |
| DONNA ZINK, a married woman, | ) ) | |
| Appellant. | ) ) ) | FILED: January 23, 2017 |

LEACH, J. — The Department of Corrections (Department) and Donna Zink each appeal a trial court order enjoining disclosure of certain special sex offender sentencing alternative (SSOSA) evaluations. Zink submitted a Public Records Act (PRA)[1] request for all SSOSA evaluations since 1990. The respondents (collectively Doe), a class of level I sex offenders, sued to prevent the Department from disclosing their evaluations. The trial court enjoined the Department from releasing SSOSA evaluations of level I sex offenders who, as of the request date, had complied with their conditions of supervision. Because each evaluation necessarily includes a diagnosis of the offender's mental

---

[1] Ch. 42.56 RCW.

conditions, it contains confidential health care information under Washington's Uniform Health Care Information Act (UHCIA).[2] Without redaction of this information, they are thus exempt from PRA disclosure. Because experience and logic show that allowing plaintiffs to use pseudonyms in these circumstances does not implicate the Washington Constitution, the trial court did not err in allowing the plaintiffs to proceed under pseudonyms. And because the PRA does not prohibit plaintiffs from suing as class representatives, the trial court did not err in certifying the class here. We affirm.

## FACTS

The Washington Legislature enacted SSOSA as part of the Sentencing Reform Act of 1981.[3] SSOSA provides a sentencing alternative for first time sex offenders.[4] It allows a trial court to suspend an offender's felony sentence if the offender meets certain statutory criteria.[5] When doing this, the court must impose certain conditions, including sex offender treatment and a term of community custody.[6]

---

[2] Ch. 70.02 RCW.
[3] State v. Canfield, 154 Wn.2d 698, 701 n.1, 116 P.3d 391 (2005); ch. 9.94A RCW.
[4] State v. Pannell, 173 Wn.2d 222, 227, 267 P.3d 349 (2011).
[5] RCW 9.94A.670(2), (4); Pannell, 173 Wn.2d at 227.
[6] RCW 9.94A.670(5)(a)-(d).

To be considered for a SSOSA, an eligible offender must undergo an evaluation to determine whether the offender is "amenable to treatment."[7] An offender is amenable to treatment if the offender and the community will benefit from community-based treatment given the offender's background, history, social and economic circumstances, and psychological condition.[8] With narrow exceptions, the evaluation must be performed by a health professional certified by the Department of Health (DOH) to examine and treat sex offenders.[9] The statute generally prohibits the same provider from treating the offender if the offender receives a SSOSA.[10]

The SSOSA evaluation assesses "the offender's amenability to treatment and relative risk to the community."[11] The evaluation must contain, at a minimum, the offender's and the official versions of the crime, the offender's criminal history, "[a]n assessment of problems in addition to alleged deviant behaviors," information about the offender's employment and social life, and any

---

[7] RCW 9.94A.670(3).

[8] RCW 9.94A.670(3); State v. Oliva, 117 Wn. App. 773, 780, 73 P.3d 1016 (2003).

[9] RCW 9.94A.670(1)(a), .820(1); RCW 18.155.020.

[10] RCW 9.94A.670(13) ("unless the court has entered written findings that such treatment is in the best interests of the victim and that successful treatment of the offender would otherwise be impractical"). The statute sets exacting standards for eligible offenders: the offender had no prior sex crime convictions or convictions for violent crimes in the previous 5 years; the offense did not result in bodily harm; the victim was not a stranger to the offender; and the offender's crime did not mandate a sentence of 11 years or more. RCW 9.94A.670(2).

[11] RCW 9.94A.670(3)(b).

other evaluation measures the provider used.[12]   Based on these factors, the

provider must assess the appropriateness of community treatment, summarize

---

[12] RCW 9.94A.670(3)(a).   DOH regulations impose more specific requirements, including:

(i) A description of the current offense(s) or allegation(s) including, but not limited to, the evaluator's conclusion about the reasons for any discrepancy between the official and client's versions of the offenses or allegations;

(ii) A sexual history, sexual offense history and patterns of sexual arousal/preference/interest;

(iii) Prior attempts to remediate and control offensive behavior including prior treatment;

(iv) Perceptions of significant others, when appropriate, including their ability and/or willingness to support treatment efforts;

(v) Risk factors for offending behavior including:
(A) Alcohol and drug abuse;
(B) Stress;
(C) Mood;
(D) Sexual patterns;
(E) Use of pornography; and
(F) Social and environmental influences;
(vi) A personal history including:
(A) Medical;
(B) Marital/relationships;
(C) Employment;
(D) Education; and
(E) Military;
(vii) A family history;
(viii) History of violence and/or criminal behavior;
(ix) Mental health functioning including coping abilities, adaptation style, intellectual functioning and personality attributes; and
(x) The overall findings of psychological/physiological/medical assessment if these assessments have been conducted.

WAC 246-930-320(2)(e).

-4-

its "diagnostic impressions," assess factors affecting risk to the community, assess the offender's willingness to participate, and propose a treatment plan.[13]

If the offender meets the statutory criteria and undergoes an evaluation, the trial court then must consider a number of circumstances, including the victim's opinion in particular, and decide if a SSOSA sentence is appropriate.[14]

The Department supervises offenders who receive a SSOSA.[15] Unlike other mental health treatment information, the Department does not receive a SSOSA evaluation from the provider. Rather, either the prosecutor or defense attorney usually provides the evaluation to the community corrections officer investigating the offender's history.

---

[13] WAC 246-930-320(2)(f), (g). The plan must contain:

(i) Frequency and type of contact between offender and therapist;

(ii) Specific issues to be addressed in the treatment and description of planned treatment modalities;

(iii) Monitoring plans, including any requirements regarding living conditions, lifestyle requirements, and monitoring by family members and others;

(iv) Anticipated length of treatment; and

(v) Recommended crime-related prohibitions and affirmative conditions, which must include, to the extent known, an identification of specific activities or behaviors that are precursors to the offender's offense cycle, including, but not limited to, activities or behaviors such as viewing or listening to pornography or use of alcohol or controlled substances.

RCW 9.94A.670(3)(b).

[14] RCW 9.94A.670(4).

[15] RCW 9.94A.501(4)(f).

Doe submitted unrebutted expert testimony that SSOSA sentences are effective. A 2005 study commissioned by the legislature found that offenders who complete SSOSA sentences have the lowest recidivism rates for any type of crime, including sex offenses—rates less than one third those of other offenders.[16] Nonetheless, SSOSA sentences are increasingly rare in practice even among eligible offenders. In 2005, 35 percent of offenders who met the statutory criteria received SSOSA sentences, down from 59 percent in 1986. In 2012, only 95 offenders in the state received a SSOSA sentence.

In July 2014, Donna Zink made a PRA request for all SSOSA evaluations "maintained, in the possession of or owned by the Washington State Department of Corrections from January 1, 1990 to the present." The Department responded that it would produce the evaluations after reviewing each one to determine if it contained exempt information, including victims' names. Doe filed this action to enjoin the Department from releasing evaluations of level I sex offenders.

The plaintiffs are current or former level I sex offenders who underwent SSOSA evaluations. Level I offenders are those who the Department's end-of-sentence review committee determines pose the lowest risk to the public.[17]

---

[16] The recidivism rate for sex offenders sentenced to prison terms was 16.9 percent; the corresponding rate for sex offenders who received a SSOSA sentence was 4.7 percent. These rates measure the percentage of offenders convicted of a new felony within five years of their release.

[17] RCW 72.09.345(6); RCW 13.40.217(3).

The trial court first granted a temporary restraining order and then a preliminary injunction against the Department.[18] It also allowed the plaintiffs to use pseudonyms and to represent a certified class of compliant level I offenders who have received SSOSA evaluations since 1990.[19]

Later, the trial court granted summary judgment for the plaintiffs, finding that RCW 71.05.445 and ch. 70.02 RCW exempt the evaluations from disclosure. The court permanently enjoined the Department from fulfilling Zink's request. Zink and the Department appeal.

## STANDARD OF REVIEW

This court reviews de novo a trial court's PRA decisions about exemptions and injunctions.[20] This court also reviews the record de novo in PRA cases where "the record consists of only affidavits, memoranda of law, and other documentary evidence, and where the trial court has not seen or heard testimony requiring it to assess the witnesses' credibility or competency."[21] When a party seeking summary judgment initially shows the absence of any material issue of

---

[18] Because the restraining order applied only to level I offenders, the Department began producing the evaluations of level II and III offenders per Zink's request.

[19] The plaintiff class is divided into two subclasses: offenders who actually received a SSOSA sentence and those who did not.

[20] Ameriquest Mortg. Co. v. Office of Att'y Gen., 177 Wn.2d 467, 478, 300 P.3d 799 (2013).

[21] Bainbridge Island Police Guild v. City of Puyallup, 172 Wn.2d 398, 407, 259 P.3d 190 (2011).

fact for trial, the party opposing summary judgment must produce evidence of specific facts sufficient to show a material issue.[22]

ANALYSIS

Health Care Information Exemption

The PRA requires state agencies to make records "available for public inspection and copying" unless the records are exempt under the PRA or an "other statute which exempts or prohibits disclosure of specific information or records."[23] Doe asserts that both the PRA and two "other statute[s]" exempt the records Zink requested. We agree with Doe that the unredacted evaluations that the Department intended to release are exempt from the PRA's general disclosure provision because they contain confidential health care information. We do not decide if the records can be sufficiently redacted to protect this information.

As a preliminary matter, and contrary to Zink's arguments, the Supreme Court's decision in Koenig v. Thurston County[24] does not dispose of Doe's exemption arguments. The Supreme Court considered only whether the PRA exemption for investigative records applies to SSOSA evaluations and victim

---

[22] Hash v. Children's Orthopedic Hosp., 49 Wn. App. 130, 134-35, 741 P.2d 584 (1987), aff'd, 110 Wn.2d 912, 757 P.2d 507 (1988).
[23] RCW 42.56.070(1).
[24] 175 Wn.2d 837, 287 P.3d 523 (2012).

impact statements.[25] "In cases where a legal theory is not discussed in the opinion, that case is not controlling on a future case where the legal theory is properly raised."[26]

The PRA includes an exemption for patients' health care information.[27] This exemption incorporates the confidentiality provisions of Washington's UHCIA.[28] This act protects health care information and information about mental health services.

The UHCIA prohibits disclosure of "health care information about a patient" without the patient's consent.[29] This prohibition applies to "a health care provider, an individual who assists a health care provider in the delivery of health care, or an agent and employee of a health care provider." "Health care information" includes "any information . . . that identifies or can readily be associated with the identity of a patient and directly relates to the patient's health

---

[25] See RCW 42.56.240.
[26] Berschauer/Phillips Constr. Co. v. Seattle Sch. Dist. No. 1, 124 Wn.2d 816, 824, 881 P.2d 986 (1994).
[27] RCW 42.56.360.
[28] RCW 42.56.360(2). RCW 42.56.360(1) lists types of health care information that are exempt. RCW 42.56.360(2) states, "Chapter 70.02 RCW [the UHCIA] applies to public inspection and copying of health care information of patients." The Supreme Court has interpreted this language to incorporate RCW 70.02.020. Prison Legal News, Inc. v. Dep't of Corr., 154 Wn.2d 628, 644, 115 P.3d 316 (2005) (discussing former RCW 42.17.312, which is identical to current RCW 42.56.360(2)).
[29] RCW 70.02.020(1).

care."[30] Thus, information in SSOSA evaluations is confidential under the UHCIA

and exempt under the PRA if the offenders receiving the evaluations are

"patients," that information identifies "or can readily be associated with" an

offender's identity, and the evaluation "directly relates" to the offender's health

care.[31] Information in the evaluations satisfies each of these requirements.

First, offenders are "patients" under the UHCIA. The act defines a

"patient" as "an individual who receives or has received health care."[32] This

broad definition shows no intent for the term "patient" to limit what qualifies as

"health care information."[33] Instead, the Supreme Court's decisions interpreting

---

[30] RCW 70.02.010(16). The UHCIA separately provides that "all information and records compiled, obtained, or maintained in the course of providing mental health services to either voluntary or involuntary recipients of services at public or private agencies must be confidential." RCW 70.02.230(1). But because the statute defines mental health records as "a type of health care information," RCW 70.02.010(21), we do not need to decide whether SSOSA evaluations also qualify as mental health records. If they are health care information, they are exempt under RCW 70.02.020(1); if they are not health care information, then they are not mental health records either.

[31] RCW 70.02.010(16). Although RCW 70.02.020(1) applies only to "a health care provider, an individual who assists a health care provider in the delivery of health care, or an agent and employee of a health care provider"—categories that likely would not include the Department—RCW 42.56.360(2) incorporates RCW 70.02.020 into the PRA and thus restricts disclosures by the Department. Prison Legal News, 154 Wn.2d at 644.

[32] RCW 70.02.010(32).

[33] Hines v. Todd Pac. Shipyards Corp., 127 Wn. App. 356, 366-67, 112 P.3d 522 (2005), is distinguishable. There, this court held that the predecessor to the UHCIA did not apply to the results of an employee's contractually required drug test, in part because the test was not given to the employee as a "patient." Among other distinctions, unlike a mandatory drug test, a SSOSA evaluation determines an offender's amenability to treatment and must include a treatment plan.

-10-

RCW 70.02.020 note only two requirements for "health care information": patient identifiability and information about patient health care.[34]

Second, SSOSA evaluations identify offenders. A party opposing PRA disclosure must show "each patient's health care information is 'readily associated' with that patient" for the exemption to apply.[35] "Where there is a dispute over whether health care information is readily identifiable with a specific patient even when that patient's identity is not disclosed, the trial court can use in camera review should it need to examine unredacted records to make its independent determination."[36] This review was not necessary here because the Department does not intend to redact offenders' names from evaluations. The evaluations are thus "readily associated" with offenders.

Finally, some information in SSOSA evaluations directly relates to offenders' health care. "'Health care' means any care, service, or procedure provided by a health care provider: (a) To diagnose, treat, or maintain a patient's physical or mental condition; or (b) That affects the structure or any function of the human body."[37]

---

[34] Prison Legal News, 154 Wn.2d at 645; see also Wright v. Jeckle, 121 Wn. App. 624, 630, 90 P.3d 65 (2004).
[35] Prison Legal News, 154 Wn.2d at 645 (emphasis omitted).
[36] Prison Legal News, 154 Wn.2d at 645-46.
[37] RCW 70.02.010(14).

The Department would interpret "to" in this definition to mean "for the sole purpose of." It thus contends that the evaluations do not directly relate to offenders' health care because the evaluations are not for the sole purpose of treating offenders. It asserts that the evaluations are only "mandatory forensic evaluation[s]" to assist a court in making a sentencing decision. Doe responds that the evaluations can have more than one purpose. We agree with Doe.

Nothing in the statute supports the Department's narrow interpretation of health care.[38] The SSOSA statute requires an evaluation to include "[a]n assessment of problems in addition to alleged deviant behaviors," information about the offender's employment and social life, and any other evaluation measures the provider used.[39] DOH regulations further require that the evaluation include, among other information, "[a] sexual history, sexual offense history and patterns of sexual arousal/preference/interest," "[r]isk factors for offending behavior," and medical, marital, relationship, and family histories. The evaluations must also address "[m]ental health functioning including coping abilities, adaptation style, intellectual functioning and personality attributes" and

---

[38] The relevant definition of "to" is "used as a function word to indicate purpose, intention, tendency, result, or end." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2401 (2002).

[39] RCW 9.94A.670(3)(a)(iii), (iv), (v).

include "overall findings of psychological/physiological/medical assessment if these assessments have been conducted."[40]

The evidence Doe submitted also indicates that the evaluations contain medical, mental health, substance abuse, and sexual histories; results of physical and psychological tests; amenability to treatment; and information about the offenders' families, as well as their victims.[41] The Department introduced no evidence to rebut the facts in these declarations.

Thus, governing law and our review of the record both indicate that SSOSA evaluations include a "service[ ] or procedure provided by a health care provider" to "diagnose . . . a patient's . . . mental condition."[42] They therefore directly relate to offenders' health care.

---

[40] WAC 246-930-320(2)(e). To assess a medical condition is to diagnose it. BLACK'S LAW DICTIONARY 548 (10th ed. 2014) (defining "diagnosis" as "[t]he determination of a medical condition (such as a disease) by physical examination or by study of its symptoms").

[41] Doe submitted declarations from two attorneys who represent sex offenders, one of whom is a member of the Sex Offender Policy Board; from the board of the Washington Association for the Treatment of Sexual Abusers; from the executive director of the national Association for the Treatment of Sexual Abusers; from two psychologists and certified sex offender treatment providers; and from several plaintiffs. The declarations described the information offenders disclose in the evaluations. Together they indicate, as the trial court found, "SSOSA evaluations contain significant medical, mental health, and other personal information, along with the evaluator's diagnostic assessment of that information."

[42] RCW 70.02.010(14).

Because SSOSA evaluations contain health care information, if not redacted, they are exempt from PRA disclosure under RCW 42.56.360(2) and RCW 70.02.020(1). Because we hold that these statutes exempt the evaluations that the Department proposed releasing, we do not reach Doe's alternative arguments that RCW 71.05.445 and RCW 70.02.250 are "other statute[s]" that exempt the evaluations from PRA disclosure.

We do not decide whether some portion of a SSOSA evaluation would fall outside the exemption. "In general, the PDA does not allow an agency to withhold exempt records in their entirety. Rather, agencies must withhold only those portions of individual records which come under a specific exemption and disclose the rest."[43]

Here, the Department's only declaration in opposition to the preliminary injunction suggested that names of victims may be exempt. A footnote in the Department's brief stated that the Department would also redact information that "clearly qualifie[s] as medical information." But the Department takes the position, which it stated firmly at oral argument, that the evaluations contain no medical information. Similarly, Doe did not identify any information that would not be exempt under his interpretation of the UHCIA. Both sides thus framed exemption and disclosure as all or nothing propositions.

---

[43] Tacoma Pub. Library v. Woessner, 90 Wn. App. 205, 224, 951 P.2d 357 (1998).

Doe showed that the evaluations contain health care information. Our record does not include any SSOSA evaluations. We have nothing before us that would allow us to decide if any specific portions are not exempt. As a result, because the evaluations contain exempt health care information that the Department has refused to redact, we affirm the trial court.[44]

Pseudonyms

In Zink's separate appeal, she contends that the trial court improperly sealed court records when it allowed the plaintiffs to use pseudonyms. She asserts that the trial court had to hold a hearing in open court and apply the five factors from Seattle Times Co. v. Ishikawa[45] before allowing this. We disagree.

The Washington Constitution creates a presumption of openness in trial court proceedings.[46] "Whether an Ishikawa analysis is necessary depends on

---

[44] We leave open to Zink the opportunity to ask the trial court for an in camera review of the evaluations to decide if they include nonexempt information subject to disclosure.

[45] 97 Wn.2d 30, 640 P.2d 716 (1982). Under Ishikawa,
> (1) the proponent of closure must make a showing of compelling need, (2) any person present when the motion is made must be given an opportunity to object, (3) the means of curtailing open access must be the least restrictive means available for protecting the threatened interests, (4) the court must weigh the competing interests of the public and of the closure, and (5) the order must be no broader in application or duration than necessary.

John Doe 1 v. Prosecuting Att'y, 192 Wn. App. 612, 617, 369 P.3d 166 (2016) (citing Ishikawa, 97 Wn.2d at 37-39).

[46] CONST. art. I, § 10 ("Justice in all cases shall be administered openly, and without unnecessary delay.").

whether article I, section 10 applies."[47] And "[w]hether article I, section 10

applies depends on application of the experience and logic test."[48] Thus, we ask

whether, under the experience prong, "'the place and process have historically

been open to the press and general public.'"[49] We then ask whether, under the

logic prong, "'public access plays a significant positive role in the functioning of

the particular process.'"[50]

The title of a complaint must "include the names of all the parties."[51] The

federal courts have a substantively identical rule.[52]

But plaintiffs' real names have not "historically been open to the press and

general public" when the nature of the action shows that compelling them to use

their real names would chill their exercise of their right to seek relief. Numerous

opinions from the Supreme Court[53] and this court[54] demonstrate this

---

[47] State v. S.J.C., 183 Wn.2d 408, 412, 352 P.3d 749 (2015).

[48] S.J.C., 183 Wn.2d at 412-13 (citing In re Det. of Morgan, 180 Wn.2d 312, 325, 330 P.3d 774 (2014)).

[49] S.J.C., 183 Wn.2d at 417 (internal quotation marks omitted) (quoting Morgan, 180 Wn.2d at 325).

[50] S.J.C., 183 Wn.2d at 430 (internal quotation marks omitted) (quoting Morgan, 180 Wn.2d at 325).

[51] CR 10(a)(1).

[52] FED. R. CIV. P. 10(a).

[53] John Doe v. Puget Sound Blood Ctr., 117 Wn.2d 772, 819 P.2d 370 (1991) (recipient of HIV-infected (human immunodeficiency virus) blood sought name of donor); John Doe v. Finch, 133 Wn.2d 96, 942 P.2d 359 (1997) (Doe sued psychologist for outrage over psychologist's romantic relationship with Doe's wife); John Doe v. Gonzaga Univ., 143 Wn.2d 687, 24 P.3d 390 (2001) (student sued university over investigation of sexual assault claims against him), rev'd, 536 U.S. 273, 122 S. Ct. 2268, 153 L. Ed. 2d 309 (2002); Jane Doe v.

longstanding and previously uncontroversial practice in Washington. The

experience prong thus shows that a routine and desirable practice exists among

Washington courts to allow parties, when appropriate, to proceed under

pseudonyms.

The logic prong also supports pseudonymity in this case. Certain

circumstances require pseudonymity at the time a complaint is filed to allow

Washington courts to provide any practical relief. While in general "[t]he people

_____

Dunning, 87 Wn.2d 50, 549 P.2d 1 (1976) (unwed mother sued to obtain certified copy of conventional birth certificate for child).

[54] See, e.g., John Doe v. Grp. Health Coop. of Puget Sound, Inc., 85 Wn. App. 213, 932 P.2d 178 (1997) (employee brought UHCIA and invasion of privacy claims over health care provider's disclosure of name and consumer numbering in training exercise on processing mental health claims); Jane Doe v. Boeing Co., 64 Wn. App. 235, 823 P.2d 1159 (1992) (transgender employee sued employer for disability discrimination), rev'd, 121 Wn.2d 8, 846 P.2d 531 (1993); John Doe v. Spokane & Inland Empire Blood Bank, 55 Wn. App. 106, 780 P.2d 853 (1989) (plaintiffs with AIDS (acquired immune deficiency syndrome) brought class action suit against producers and distributors of blood products); Jane Doe v. Fife Mun. Court, 74 Wn. App. 444, 874 P.2d 182 (1994) (class of plaintiffs convicted of alcohol-related offenses sought to recover court costs); John Doe v. Dep't of Transp., 85 Wn. App. 143, 931 P.2d 196 (1997) (sexual harassment suit by ferry worker); Jane Doe v. Corp. of President of Church of Jesus Christ of Latter-Day Saints, 141 Wn. App. 407, 167 P.3d 1193 (2007) (plaintiffs sued stepfather and church over alleged sexual abuse by stepfather).

A number of unpublished opinions also reflect this practice. See Jane Doe v. Pierce County, noted at 125 Wn. App. 1017 (2005) (plaintiff requested public records regarding employment office's investigation of her); John Doe v. Wash. State Bd. of Accountancy, noted at 150 Wn. App. 1036 (2009) (accountant sought declaration that he had mental health disability covered by Americans with Disabilities Act of 1990, 43 U.S.C. § 12101); John Doe v. Zylstra, No. 71123-7-I, (Wash. Ct. App. Feb. 9, 2015) (unpublished), http://www.courts.wa.gov/opinion/pdf/711237.pdf) (patients sued medical clinic over employee's intentional conduct).

have a right to know who is using their courts," "[t]here are exceptions."[55]

Washington courts have explained their reasoning only briefly. The Supreme

Court has noted that "a plaintiff may proceed under a pseudonym to protect a

privacy interest."[56] In one case, it adopted a substitute case name "[t]o avoid

revealing the name of either the mother or child" when the mother was seeking a

birth certificate.[57] Where an employee sued his employer for sexual harassment,

this court used a pseudonym "[b]ecause of the nature of the allegations in th[e]

case."[58] Our courts may not have analyzed this issue before because the use of

pseudonyms has gone unchallenged in these cases. They may not have

addressed the issue because the measure's practical necessity is obvious. For

example, in a case bearing some similarities to this one, an employee used a

pseudonym in bringing UHCIA and invasion of privacy claims where his health

care provider used his name and consumer number in a training exercise for

processing mental health claims.[59] There, as here, the plaintiff opposed the

disclosure of what he claimed was confidential health care information; and

---

[55] John Doe v. Blue Cross & Blue Shield United of Wis., 112 F.3d 869, 872 (7th Cir. 1997).
[56] N. Am. Council on Adoptable Children v. Dep't of Soc. & Health Servs., 108 Wn.2d 433, 440, 739 P.2d 677 (1987) (holding that court could not appoint organization as guardian ad litem for unnamed children whom the organization did not know and could not describe).
[57] Dunning, 87 Wn.2d at 50 n.1.
[58] Dep't of Transp., 85 Wn. App. at 143 n.1.
[59] Grp. Health, 85 Wn. App. at 214-15.

there, as here, compelling the plaintiff to use his real name would have greatly impaired the court's ability to provide relief.

The federal appellate courts that have considered this matter all agree with this logic. Although federal law lacks a provision like Washington's article I, section 10, federal courts recognize parallel rights under the First Amendment.[60] We therefore look to those courts for guidance. The Eleventh Circuit has explained that pseudonyms are appropriate where "the injury litigated against would be incurred as a result of the disclosure of the plaintiff's identity."[61] To this end, federal courts have adopted balancing tests: the Eleventh, Tenth, and Fifth Circuits allow a plaintiff to proceed pseudonymously where "the plaintiff has a substantial privacy right which outweighs the customary and constitutionally-embedded presumption of openness in judicial proceedings."[62] The Ninth and Second Circuits ask whether "the party's need for anonymity outweighs prejudice to the opposing party and the public's interest in knowing the party's identity."[63]

---

[60] Thomas Doe v. Stegall, 653 F.2d 180, 185 (5th Cir. 1981) ("First Amendment guarantees are implicated when a court decides to restrict public scrutiny of judicial proceedings.").

[61] Bill W. Doe v. Frank, 951 F.2d 320, 324 (11th Cir. 1992).

[62] Jane Roe II v. Aware Woman Ctr. For Choice, Inc., 253 F.3d 678, 685 (11th Cir. 2001); see M.M. v. Zavaras, 139 F.3d 798, 803 (10th Cir. 1998) (quoting Frank, 951 F.2d at 324); Stegall, 653 F.2d at 186 (applying substantively similar standards).

[63] Does I Thru XXIII v. Advanced Textile Corp., 214 F.3d 1058, 1068 (9th Cir. 2000); Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 189-90 (2d Cir. 2008) (providing nonexhaustive list of ten factors).

Experience and logic thus show that allowing plaintiffs to proceed under pseudonyms does not implicate article 1, section 10 where the public's interest in the plaintiffs' names is minimal and use of those names would chill their ability to seek relief. Here, the trial court found that "[f]orcing [p]laintiffs to disclose their identities to bring this action would eviscerate their ability to seek relief"; that the plaintiffs demonstrated a significant risk of harm if their identities are disclosed; that the individual names "have little bearing on the public's interest in the dispute or its resolution"; that pseudonymity would not prejudice the Department; that the plaintiffs' interests in anonymity outweighed the public's interest in knowing their names; and that "no reasonably viable alternatives" existed. While Zink assigns error to these findings, she does not explain how they are incorrect. Nor did she submit evidence to contradict them. Our review of the record shows that substantial evidence supports the trial court's findings and that the trial court did not abuse its discretion in applying the Ishikawa factors.[64]

Class Certification

Zink also asserts that the PRA prohibited the trial court from certifying a class of level I sex offenders "who are either compliant with the conditions of registration or have been relieved of the duty to register, and who underwent an evaluation to determine if they were eligible for a [SSOSA] after January 1,

---

[64] S.J.C., 183 Wn.2d at 412-13.

1990."[65] We review statutory interpretation issues de novo[66] and decisions to certify classes of plaintiffs for abuse of discretion.[67] Here, the trial court properly interpreted governing law and did not abuse its discretion in certifying a class.

Because "the PRA statutes do not create a special proceeding subject to special rules," the normal civil rules apply to PRA proceedings.[68] Thus, the rule governing class certification, CR 23, controls here. Courts interpret that rule liberally.[69]

As Zink does not contend that the class certification did not comply with CR 23, the trial court did not err in certifying the class of plaintiffs unless the PRA prohibits class actions altogether. It does not.

Zink relies on the PRA's statement that a court can enjoin disclosure "upon motion and affidavit by an agency or its representative or a person who is named in the record or to whom the record specifically pertains."[70] She does not

---

[65] Considering the same argument from Zink, the Supreme Court recently noted in John Doe A v. Washington State Patrol, 185 Wn.2d 363, 385-86, 374 P.3d 63 (2016), that "even if the class were improperly certified, a decision decertifying the class or remanding to the trial [court] would serve no purpose and would cost the litigants time and money, as the issue on which the class members brought suit has been decided."

[66] City of Spokane v. Rothwell, 166 Wn.2d 872, 876, 215 P.3d 162 (2009).

[67] Miller v. Farmer Bros. Co., 115 Wn. App. 815, 820, 64 P.3d 49 (2003).

[68] Neigh. All. of Spokane County v. County of Spokane, 172 Wn.2d 702, 716, 261 P.3d 119 (2011).

[69] Moeller v. Farmers Ins. Co. of Wash., 173 Wn.2d 264, 278, 267 P.3d 998 (2011).

[70] RCW 42.56.540.

-21-

dispute that the class of plaintiffs are named in their SSOSA evaluations or that the evaluations specifically pertain to them.

We construe the class action rule "liberally in favor of permitting certification."[71] When a court certifies a class, the representative plaintiffs stand in for all other members of the class; those members are treated as parties to the litigation.[72] A decision in the case then binds all unexcluded members of the class.[73] Because the plaintiffs represent an entire class, even statutes the legislature phrases in individual terms allow for class actions.[74] The plaintiffs here can thus form a class to bring this PRA action.[75]

Temporary Restraining Order and Preliminary Injunction

Zink asks that we decide the proper standard for issuing a preliminary injunction in a PRA case. That issue became moot when the trial court issued a permanent injunction.[76] We decline to address it.

---

[71] Sitton v. State Farm Mut. Auto. Ins. Co., 116 Wn. App. 245, 256, 63 P.3d 198 (2003).

[72] Sitton, 116 Wn. App. at 250.

[73] CR 23(c)(3).

[74] See Smith v. Behr Process Corp., 113 Wn. App. 306, 346, 54 P.3d 665 (2002) (allowing relief for represented class members, not merely named plaintiffs, even though the Consumer Protection Act, ch. 19.86 RCW, authorizes relief for those who "bring a civil action," RCW 19.86.090); Califano v. Yamasaki, 442 U.S. 682, 700-01, 99 S. Ct. 2545, 61 L. Ed. 2d 176 (1979) (allowing for class certification under federal rules even where statute refers to an "individual").

[75] RCW 42.56.540.

[76] See State ex rel. Carroll v. Simmons, 61 Wn.2d 146, 149, 377 P.2d 421 (1962).

-22-

Fees and Costs

Finally, because Zink does not prevail in this appeal, we deny her request for appellate costs under RAP 14.1. And because the respondents do not ask for attorney fees, we do not award them any either.

## CONCLUSION

We affirm the trial court order enjoining disclosure of level I sex offenders' SSOSA evaluations.

_Leach, J._

WE CONCUR:

_Spearman, J._

_Cox, J._