IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | | |
|---|---|---|
| ERIC D. VOLKERT, | ) | No. 77308-9-I |
| | ) | |
| Respondent, | ) | DIVISION ONE |
| | ) | |
| v. | ) | PUBLISHED OPINION |
| | ) | |
| FAIRBANK CONSTRUCTION CO., INC., | ) | |
| a Washington corporation, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| ELIZABETH ZIEGLER, PH.D., | ) | |
| | ) | |
| Non-Party Petitioner. | ) | |
| | | FILED: April 8, 2019 |

HAZELRIGG-HERNANDEZ, J. — Eric D. Volkert subpoenaed all of Dr. Elizabeth Ziegler's past medical reports prepared for litigation in an attempt to show her bias against treating doctors. The trial court ordered Ziegler to produce the records. Fairbank Construction Co. and Ziegler seek reversal, arguing that Washington's Uniform Health Care Information Act (UHCIA) prohibits disclosure of the records absent authorization from the prior examinees or notice and an opportunity to object. Because the trial court applied the wrong standard and the reports contain confidential health care information, we reverse.

FACTS

On September 5, 2012, Eric Volkert was injured while working on a construction site at which Fairbank Construction Company, Inc. was the general contractor. Volkert struck his head on a piece of lumber protruding from the back of a truck owned by Fairbank. On September 26, 2013, Volkert filed a suit for negligence against Fairbank and claimed that he had suffered severe and permanent injuries from the incident, including traumatic brain injury (TBI) and neurological injuries. Fairbank asserted contributory negligence of the plaintiff as an affirmative defense.

Volkert's treating doctors testified that he had sustained a TBI as a result of the accident. Fairbank hired neuropsychologist Elizabeth A. Ziegler, Ph.D. to give her expert opinion on Volkert's injuries. Ziegler holds a Ph.D. in clinical psychology, completed an accredited postdoctoral fellowship in clinical neuropsychology, and is a practicing, licensed psychologist in Washington. Ziegler reviewed Volkert's medical records, conducted a forensic interview with Volkert, and performed her own neuropsychological evaluation of Volkert. Her evaluation included administration of sixteen individual tests as well as a "[b]attery of free standing and embedded performance validity tests." She prepared a lengthy report in which she opined that there was no objective evidence of concussion or mild TBI stemming from the accident. In the report, Ziegler noted that a brain injury is diagnosed based on acute characteristics at the time of the event and stated that she could not find support for such a diagnosis in Volkert's medical records from the day of the accident. She also found that inconsistencies in his responses

during the neuropsychological evaluation indicated that malingering may have been a factor.

The case went to trial in July 2016 and the jury found Volkert and Fairbank equally negligent. The jury awarded Volkert past and future economic damages of $334,000 but did not award any non-economic damages for pain and suffering. Upon Volkert's motion for a new trial on damages, the trial court found that the jury's award of $0 for non-economic damages was not supported by substantial evidence and ordered a new trial on damages only.

Volkert deposed Ziegler before the second trial. At the deposition, Ziegler estimated that she works with the defense in personal injury cases about 99% of the time and has prepared forensic reports for about 225 to 250 cases. She keeps copies of most of the forensic reports that she writes on a laptop. Although she was not able to estimate how often she disagrees with plaintiffs' treating healthcare providers, she asserted that she was "very, very likely" to disagree with treatment plans in cases of mild TBI "because they're not evidence-based." Ziegler agreed that, based on an empirical review analyzing reports prepared during litigation from neuropsychologists throughout the country, malingering was identified as a factor in 30-50% of cases. However, she did not know the rate at which she found malingering to be a factor in her examinations. She stated that she does not track this data and would have to spend "weeks to months going through each report" and conducting statistical analysis to produce that information.

Volkert's counsel questioned Ziegler regarding her awareness of anything that limited her ability to use the reports that she had created and the degree of

confidentiality that was afforded to the information. Ziegler responded that she did not know of any limitations on her use of her reports or ability to testify to their contents apart from motions in limine. She testified that she informs examinees during the consent process that the examination and whatever is in their records is "an open book." She admitted that she testifies in open court regarding the content of her reports and does not attempt to hide the identity of the examinee because "the case is such-and-such versus such-and-such. It's very obvious who I'm talking about when I'm on the stand, so there's no reason to take protective measures." Counsel did not ask whether Ziegler had testified to or otherwise disclosed the contents of any of her reports outside of the examinee's own case. When asked about the possibility of Volkert's counsel looking through her past reports to identify patterns, Ziegler expressed concern that disclosing the reports would infringe on the past examinees' privacy and stated that she did not understand the consent to disclosure to apply outside examinees' own cases.

The same day, Volkert subpoenaed from Ziegler all medical legal reports and reviews that she had authored concerning any Personal Injury Protection (PIP) claims, Underinsured Motorist (UIM) claims, or as otherwise ordered under CR 35. Ziegler was directed to produce the reports within eight days. Fairbank lodged seven objections to the subpoena, arguing that the subpoena imposed an undue burden and expense on Ziegler, the materials requested were beyond the scope of discovery permitted, the subpoena did not provide sufficient time for production of the requested material, the subpoena requested the disclosure of privileged, confidential, and protected information, the subpoena requested materials and

expert opinions which were unrelated to the case in question, the subpoena was so broad and overreaching that a detailed description of the exact nature of the privileges involved was not possible in the time allotted to respond, and Ziegler had never received permission through the consent process from the subjects of the reports requested to disseminate their information to other attorneys outside of the case in connection with which they were interviewed.

In response to Fairbank's objections, Volkert proposed a stipulation that would require Ziegler to produce any reports that were not subject to protective orders preventing disclosure. However, the stipulation would ensure that the subjects of the reports would only be referenced by their initial at trial and that no "highly sensitive information contained in the report such as rape, incest, abortions, sexual abuse, HIV status, or similar matters" would be referenced by either party.

The stipulation specified that any examination regarding these reports at trial would focus on "matters related to patterns of [Ziegler's] opinions that can be shown over the body of work that she has performed as a forensic expert," particularly concerning findings of malingering and disagreements with treating doctors regarding TBI and treatment plans. The proposed stipulation did not provide for redaction of the records before they were disclosed to Volkert. Ziegler did not agree to produce the records and Fairbank did not sign the proposed stipulation.

Volkert then filed a motion requesting that the court strike Ziegler's objections to the subpoena and order her to produce the documents. In the motion, Volkert argued that the reports were not confidential and were relevant to show

Ziegler's bias against treating doctors. Through independent counsel, Ziegler filed a response to the motion arguing that the reports contained confidential health information, the request was unduly burdensome because Ziegler would be required to redact each of the reports extensively, and that production and analysis of the reports would not lead to any new evidence because Ziegler had already asserted at her deposition that she almost always testifies for defendants and routinely disagrees with treating physicians. Ziegler included as an exhibit an example of a stipulation regarding a CR 35 examination which includes the following term:

> No part of the examiner's report, testing, conclusions, opinions or files may be given or shown to anyone other than defendant, defense counsel and staff, and defendant's expert witnesses for any reason. The doctor and defendant's counsel should be permitted to use these for trial preparation and in trial only. They should not be disseminated to any other person at any time for any reason.

The sample stipulation was not from one of Ziegler's files and was signed by a different doctor. Counsel for Ziegler noted that, in reviewing her own files, over two thirds of the CR 35 stipulations contained a similar confidentiality provision. She also noted that these stipulations are not always provided to the examiners and Ziegler would therefore have to check the court records of every case to determine whether she could disclose the report. In his reply, Volkert argued that Ziegler had no standing to assert the privacy interests of the subjects of her reports and that, if the subjects had a right to privacy in these reports, they would "obviously" assert it to stop her from testifying in their own cases.

On August 23, 2017, the court struck Ziegler's objections to the subpoena, specifically noting that the "reports are relevant to show bias, are not health care

- 6 -

records of Dr. Ziegler's patients so RCW 70.02 does not apply, and the subpoena is not overbroad or burdensome. Counsel shall redact any personal identifiers and use initials only for any reports filed as exhibits."

On August 30, 2017, Fairbank filed a motion for emergency stay of superior court proceedings and a motion for discretionary review in this court. The stay was granted on September 1, 2017. This court granted discretionary review on September 27, 2017, finding that the trial court's order substantially altered the status quo within the meaning of RAP 2.3(b)(2) and that the Petitioners had made a sufficient showing of probable error to warrant review.

## DISCUSSION

Fairbank and Ziegler contend that the trial court committed error when it struck the objections to Volkert's subpoena because Ziegler's reports are subject to the protections of Washington's Uniform Health Care Information Act[1] (UHCIA) and therefore cannot be disclosed absent notice to the examinees and an opportunity to object. Because the trial court's order misstated the standard for applicability of the UHCIA and we are unable to say that none of Ziegler's reports contain qualifying health care information, we reverse.

Normally, an appellate court reviews trial court discovery rulings for abuse of discretion. T.S. v. Boy Scouts of America, 157 Wn.2d 416, 423, 138 P.3d 1053 (2006). However, when the ruling is based upon interpretation of statutes or judicial decisions, it constitutes an issue of law and is subject to de novo review. Fellows v. Moynihan, 175 Wn.2d 641, 649, 285 P.3d 864 (2012). Here, the trial

---

[1] Chapter 70.02, RCW

held that the reports were discoverable in their unredacted form because they were "not health care records of Dr. Ziegler's patients so RCW 70.02 does not apply." Because this ruling was based upon an interpretation of RCW 70.02, the ruling is subject to de novo review.

The Petitioners contend that Ziegler's reports contain health care information of the examinees and are therefore subject to the protections of the UHCIA. "The purpose of statutory construction is to give effect to legislative intent, and when a statute is unambiguous, we derive its meaning from the plain language of the statute alone." Murphy v. State, 115 Wn. App. 297, 306, 62 P.3d 533 (2003) (citing State v. Glas, 147 Wn2d. 410, 415, 54 P.3d 147 (2002)). The Supreme Court has stated in the past that "Chapter 70.02 RCW is not ambiguous." Berger v. Sonneland, 144 Wn.2d 91, 105, 26 P.3d 257 (2001).

When enacting the UHCIA in 1991, the legislature made a number of findings, including the following:

> (1) Health care information is personal and sensitive information that if improperly used or released may do significant harm to a patient's interests in privacy, health care, or other interests.
>
> . . .
>
> (3) In order to retain the full trust and confidence of patients, health care providers have an interest in assuring that health care information is not improperly disclosed and in having clear and certain rules for the disclosure of health care information.
>
> (4) Persons other than health care providers obtain, use, and disclose health record information in many different contexts and for many different purposes. It is the public policy of this state that a patient's interest in the proper use and disclosure of the patient's health care information survives even when the information is held by persons other than health care providers.

RCW 70.02.005.

Under the UHCIA, "a health care provider . . . may not disclose health care information about a patient to any other person without the patient's written authorization" unless the disclosure is specifically allowed elsewhere in the Act. RCW 70.02.020(1). "Health care information" is defined as "any information, whether oral or recorded in any form or medium, that identifies or can readily be associated with the identity of a patient and directly relates to the patient's health care." RCW 70.02.010(17). A "patient" is simply defined as "an individual who receives or has received health care." RCW 70.02.010(32). "Health care" is in turn defined as "any care, service, or procedure provided by a health care provider . . . [t]o diagnose, treat, or maintain a patient's physical or mental condition." RCW 70.02.010(15). A "health care provider" is "a person who is licensed, certified, registered, or otherwise authorized by the law of this state to provide health care in the ordinary course of business or practice of a profession." RCW 70.02.010(19). The UHCIA does not contain any requirement that a doctor-patient relationship exist between the health care provider and patient for its provisions to apply.

The UHCIA permits disclosure of health care information in the course of discovery so long as the attorney seeking discovery "provide[s] advance notice to the health care provider and the patient or the patient's attorney . . . indicating the health care provider from whom the information is sought, what health care information is sought, and the date by which a protective order must be obtained to prevent the health care provider from complying." RCW 70.02.060(1). This process is necessary to "give the patient and the health care provider adequate

time to seek a protective order," which is specified as a time period of at least fourteen days. Id. Only after the attorney seeking discovery has complied with these procedures may the request for discovery be served on the health care provider. Id. Unless the patient has previously consented to disclosure of the information in writing, the health care provider is not permitted to disclose the requested information if the requesting attorney has not followed these procedures. RCW 70.02.060(2). If the requestor complies with these requirements and there is no protective order forbidding disclosure, the health care provider shall disclose the information. Id. A person who has complied with these requirements may maintain an action against a health care provider or facility who has not complied for actual damages. RCW 70.02.170.

Relatively few cases have interpreted the provisions of the UHCIA. The most relevant and important discussion of these issues can be found in John Doe G v. Dep't of Corrections, in which the Washington Supreme Court ruled that special sex offender sentencing alternative (SSOSA) evaluations were not covered by the UHCIA. 190 Wn.2d 185, 410 P.3d 1156 (2018). The plaintiff in John Doe G submitted a request under the Public Records Act[2] (PRA) for SSOSA evaluations "held, maintained, in the possession of or owned" by the Department of Corrections (DOC). 190 Wn.2d at 189. The PRA requires state agencies to produce records for public inspection upon request unless the records are exempt from disclosure under the PRA itself or another statute. RCW 42.56.070(1). "A SSOSA is a sentencing alternative that allows a trial court to suspend a first time sex offender's

---

[2] Chapter 42.56, RCW

felony sentence if that offender meets certain statutory criteria." John Doe G, 190 Wn.2d at 192. SSOSA evaluations are used to determine whether the offender is amenable to treatment and assess their level of risk to the community. Id. The evaluations contain the offender's version of the facts and the official version of the facts, the offender's offense history, an assessment of problems in addition to alleged deviant behaviors, the offender's social and employment situation, any other evaluation measures used, and the evaluator's diagnostic impressions. Id. at 192–93. The evaluations are performed by a certified sex offender treatment provider. Id. at 193. The governing statute generally prohibits the evaluating treatment provider from providing subsequent treatment to the offender. Id.

Upon these facts, the Court of Appeals, Division I found that the SSOSA evaluations contained health care information and were therefore covered by the UHCIA and exempt from the PRA. John Doe G v. Dep't of Corrections, 197 Wn. App. 609, 619, 391 P.3d 496 (2017). This court found that the offenders qualified as "patients" under the UHCIA and noted that the broad definition for this term evidenced the legislature's intent for this term not to "limit what qualifies as 'health care information.'" Id. at 620 (citing Hines v. Todd Pac. Shipyard Corp., 127 Wn. App. 356, 366-67, 112 P.3d 522 (2005)). This court rejected the DOC's "narrow interpretation of health care" as care, services, or procedures provided for the sole purpose of diagnosis, treatment, or maintenance of physical or mental condition. Id. at 621–22. Rather, this court found that SSOSA evaluations included a service or procedure provided by a health care provider to diagnose a patient's mental condition, and therefore directly related to the examinees' health care. Id. at 623.

Accordingly, the evaluations contained health care information and were subject to the provisions of the UHCIA. Id. at 623. This court held that unredacted SSOSA evaluations were exempt from PRA disclosure. Id.

The Supreme Court disagreed. The Court reasoned that the legislature's use of the term "directly relate[d]" instead of simply "related" indicated its intent to narrow the definition of "health care information." John Doe G, 190 Wn.2d at 193. The Court quoted Webster's Dictionary to define "directly" as "'purposefully or decidedly and straight to the mark.'" Id. Noting that the PRA requires a narrow reading of exemptions to disclosure, the Supreme Court read the definition of "health care information" as "information directly related—or in other words—for the direct purpose of health care." Id. at 193–94 (emphasis in original). The Court also noted that "[e]xempting information that is incidentally related to health care would be inconsistent with the PRA's broad disclosure policy." Id. at 194.

The Court went on to note that a SSOSA evaluation does not contain health care information because the evaluation's "purpose is to assist the court in determining whether the offender should be granted an alternative sentence instead of jail time." Id. The Court assigned importance to the fact that SSOSA evaluations are forensic, rather than medical, evaluations. Id. The Court relied on a case from 1962 for the proposition that "forensic examinations are not subject to the same privacies and privileges as medical evaluations." Id. (citing State v. Sullivan, 60 Wn.2d 214, 223–24, 373 P.2d 474 (1962)). In Sullivan, the Court considered whether the statutory doctor-patient testimonial privilege applied to statements made by the defendant to a psychiatrist during the course of her court-

ordered psychiatric examinations and treatment when the sanity or competency of the defendant to stand trial was not at issue. 60 Wn.2d at 222–23. The decision noted that the doctor-patient privilege was not available for a forensic examination by a physician because "the relationship of doctor and patient does not exist" and "the examination is not for the purpose of treatment, but for the publication of results." Id. at 223–24. The Sullivan Court quoted a 1917 case in which it said:

> In order to render a physician incompetent, the information which he is called upon to disclose must have been acquired while he was attending the patient in a professional capacity for the purpose of treating her ailments; there is no privilege when the examination is made by the physician for the express purpose of publishing the results—such, for example, as testifying in an action for personal injuries.

Id. at 224 (quoting Strafford v. Northern Pac. R. Co., 95 Wn. 450, 453, 164 P. 71 (1917)). This stands to reason—forensic evaluations of personal injury plaintiffs by defendants' experts would be useless if the plaintiffs could claim that the doctor-patient testimonial privilege prevented the experts from testifying about the results at trial. However, Sullivan did not discuss the use of the information contained in forensic examinations outside of the physician's testimony at the examinee's trial.

In John Doe G, the Supreme Court acknowledged that the doctor-patient privilege was not at issue but noted that SSOSA evaluations are made for the purpose of publishing the results to the court and with the understanding that the results will be shared. 190 Wn.2d at 194–95. The Court also noted that SSOSA evaluations are not focused on the patient's health but rather "assess[ ] treatment options in the best interest of the court, the community, the victim, and the offender." Id. at 195. The Court found it "noteworthy" that the statute generally

prohibits the treatment provider who conducts a SSOSA evaluation from subsequently treating the offender, saying that this shows the legislature's intent to separate the forensic and medical stages. Id. Although the SSOSA evaluations include the provider's diagnostic impressions and proposed treatment plan, these are used to assess the offender's amenability to treatment. Id. at 195–96. Because amenability to treatment is a threshold issue when deciding to grant an alternative sentence and because the determination includes assessment of many non-medical factors, the Court found this to be a legal determination rather than a medical one. Id. at 196–97. Therefore, the Court concluded that SSOSA evaluations were made for the purpose of aiding a court in sentencing a sex offender and held that they were not exempt from PRA disclosure under UHCIA because they do not contain health care information. Id. at 197. Notably, the record did not contain any examples of SSOSA evaluations and the Court's holding was based on its "understanding of the statutory purpose and 'ingredients' of a SSOSA evaluation, not on an actual evaluation." Id. at 189 n.1, 197 n.3.

Here, Ziegler is a licensed, practicing psychologist in Washington, so she meets the definition of a "[h]ealth care provider." RCW 70.02.010(19). Therefore, she is prohibited from disclosing a patient's health care information unless authorized by the patient or by some other provision of UHCIA. RCW 70.02.020. This determination does not appear to be in dispute.

This case differs from John Doe G in a number of ways. First, and perhaps most importantly, the record in this case contains a sample CR 35 evaluation in the form of Ziegler's report on Volkert. The report contains significant identifying

information, including his name, date of birth, and various other specific personal details. Ziegler's 62-page report on Volkert includes detailed summaries of his medical records describing his treatment on the day of the accident and follow-up appointments for over a year afterward. These summaries contain symptoms that he described to his treating doctors, personal information about stressor events in his life, and descriptions of his relationships with family members, among other details. These facts, feelings, and opinions that comprise this personal and sensitive information were conveyed to Volkert's treating physicians for the purpose of obtaining care for his physical and mental health. Accordingly, it appears that the information contained within the reports is health care information and is protected by UHCIA.

The Supreme Court in John Doe G devoted significant space to analyzing the meaning of the word "directly" but did not give any guidance as to the meaning of the term "information". See 190 Wn.2d at 193–94. When enacting the UHCIA, the legislature found that the Act concerned "personal and sensitive information that if improperly used or released may do significant harm to a patient's interests in privacy, health care, or other interests." RCW 70.02.005(1). Although the Supreme Court began by considering "whether SSOSA evaluations . . . contain health care information," the Court's language subtly shifted when it later described the "pertinent inquiry" as "whether a SSOSA evaluation directly relates to a patient's health care." John Doe G, 190 Wn.2d at 193 (internal brackets and quotation marks omitted) (citing RCW 70.02.010(16)). The Court noted that the legislature could have defined "health care information" as any information related

to health care rather than directly related, but the legislature also could have chosen to protect "medical records" rather than "health care information." Id. The wording of the Act and the findings that introduce it seem to indicate that the legislature intended to protect a broader range of sensitive, personal information that can be contained within a variety of documents.

Although the Supreme Court read "directly related to health care" narrowly, it did so noting that the PRA requires such a narrow reading of exemptions to disclosure. John Doe G, 190 Wn.2d at 194. The PRA recognizes that the people have delegated their authority to govern themselves to the agencies that serve them and remaining informed is integral to supervising and maintaining control over those systems. RCW 42.56.030. A narrow reading of exemptions serves this public policy. Id. The provisions of the PRA will supersede those of any other act if the two conflict. Id.

In this case, the strong public policy in favor of disclosure for the sake of governmental transparency does not apply because the requests for disclosure are discovery requests rather than public record requests. Generally, parties may obtain discovery regarding any matter that is relevant and not privileged. CR 26(a). However, a court may enter a protective order limiting or modifying discovery "to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." CR 26(c). Courts also weigh privacy interests against the needs of the litigant seeking disclosure when considering motions to limit discovery. Boy Scouts of America, 157 Wn.2d at 430. The UHCIA contains a specific provision governing discovery of health care information. RCW 70.02.060.

Documents containing protected information are still discoverable after the requesting party takes the requisite measures to inform patients that it is seeking disclosure of their information, therefore allowing patients sufficient time to obtain protective orders, if necessary. Id.

This does not conflict with the Supreme Court's discussion of Sullivan. As the Supreme Court noted, neither John Doe G nor this case involved a claim of doctor-patient privilege. John Doe G, 190 Wn.2d at 194. The Court extrapolated that Sullivan stands for the proposition that forensic and medical examinations are not subject to the same privacies and privileges. Id. Privilege is not at issue in this case. It may well be true that privacy considerations are different between forensic and medical evaluations. In the context of UHCIA, it seems that medical examinations would necessarily contain health care information and be subject to the protections of the act, while forensic examinations may not always contain qualifying health care information. However, it does not follow from the rule that the doctor-patient privilege does not apply to forensic evaluations that there is necessarily no privacy interest at all in information contained in forensic evaluations. The legislature acknowledged when enacting the UHCIA that health record information is used by people other than health care providers in many different contexts and for many different purposes. RCW 70.02.005(4). This did not change the legislature's finding that patients have a privacy interest in restricting disclosure of their health care information regardless of the context or who holds the information. RCW 70.02.005(1), (4).

In John Doe G, the Court noted that SSOSA evaluations are made for the purpose of publication to the court and with the understanding of the offender that they will be shared with others. 190 Wn.2d at 194–95. Similarly, Ziegler's forensic reports are made at the request of counsel to assist her in testifying to the results of her examinations and she informs the examinees that the confidentiality of the information that they share with her is limited because she will be testifying in open court. However, she does not seek or obtain consent from the examinees to discuss their information outside the context of their own cases. A plaintiff does not waive the right to privacy when he avails himself of the court system. Schlagenhauf v. Holder, 379 U.S. 104, 113–14, 85 S.Ct. 234, 13 L. Ed. 2d 152 (1964); accord In re Det. of Williams, 147 Wn.2d 476, 496, 55 P.3d 597 (2002) (Chambers, J., concurring).

Finally, the Supreme Court noted that, unlike an ordinary health examination, a SSOSA evaluation does not focus on the patient's health. John Doe G, 190 Wn.2d at 195. SSOSA evaluations must take into account effects of an alternative sentence such as community impact, the risk to the victim, and the interests of justice. Id. These considerations are not relevant to Ziegler's reports. Ziegler's evaluations are purely focused on the examinees' neuropsychological health.

The trial court's finding that RCW 70.02 did not apply to the reports because they were not "health care records of Dr. Ziegler's patients" was erroneous. Documents are not required to be health care records of a provider's patients to be covered by the provisions of the UHCIA. Rather, the UHCIA applies when any

kind of document contains protected health care information. Because Ziegler is a health care provider and her reports contain health care information of the examinees, she is prohibited from disclosing them except through the process specified in RCW 70.02.060. Volkert must comply with the provisions of the UHCIA governing discovery to provide notice and an opportunity to obtain a protective order to Ziegler's prior examinees.

Reversed.[3]

WE CONCUR:

Andrus, J.

Mann, ACJ

---

[3] This court considered a motion by Appellant Fairbank to strike Respondent's Statement of Additional Authorities. That motion is denied.