

**FILE**
IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON

DATE FEB 2 2 2018

CHIEF JUSTICE

This opinion was filed for record

at 8:00 a.m. on Feb 22, 2018

SUSAN L. CARLSON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

|  |  |
|---|---|
| JOHN DOE G, JOHN DOE I, and JOHN DOE J, as individuals and on behalf of others similarly situated,<br><br>    Respondents,<br><br>  v.<br><br>DEPARTMENT OF CORRECTIONS, STATE OF WASHINGTON, and DONNA ZINK, a married woman,<br><br>    Petitioners. | No. 94203-0<br><br>En Banc<br><br>Filed    FEB 2 2 2018 |

MADSEN, J.—Pro se petitioner Donna Zink and the Washington Department of Corrections (DOC) seek reversal of a published Court of Appeals decision, which affirmed the trial court's summary judgment ruling in favor of the respondents, John Does G, I, and J (John Does). This case presents two issues: (1) whether special sex offender sentencing alternative (SSOSA) evaluations are exempt from disclosure under the Public Records Act (PRA), chapter 42.56 RCW, because they contain "health care information," and (2) whether pseudonymous litigation was proper in this action.

We hold that SSOSA evaluations do not contain "health care information" because they are forensic examinations done for the purpose of aiding a court in sentencing a sex offender.[1] We also hold that pseudonymous litigation was improper in this action because the trial court did not adhere to the requirements of article 1, section 10 of the Washington Constitution and General Rule (GR) 15. Accordingly, we reverse the Court of Appeals.

## FACTS

In July 2014, Zink sent a PRA request to the DOC for all SSOSA evaluations "held, maintained, in the possession of or owned" by the DOC since 1990. Clerk's Papers (CP) at 116. The DOC responded to Zink, intending to release the SSOSA evaluations on an installment basis. The DOC explained that it would review the SSOSA evaluations and make appropriate redactions as required under the PRA before disclosure.

Washington classifies sex offenders as either level I, II, or III based upon the risk the offender poses to the community at large. RCW 72.09.345(6). The John Does are a class—all of whom underwent SSOSA evaluations—comprised of two former level I sex offenders who have been relieved of the duty to register, and one current and compliant level I sex offender. In response to Zink's PRA request, the John Does filed an action seeking to enjoin the DOC from releasing the SSOSA evaluations of level I sex

---

[1] This record does not contain actual SSOSA documents. There may be situations in which a SSOSA evaluation is accompanied by documents that may trigger PRA protection.

offenders. They brought the action in pseudonym, naming the DOC as defendant and Zink as requester.

On September 17, 2014, the John Does obtained a temporary restraining order (TRO), which prevented the DOC from releasing any SSOSA evaluations of level I sex offenders. Upon the TRO's expiration, the trial court granted the John Does a preliminary injunction. The court also granted the John Does' motion to proceed in pseudonym.

On October 30, 2015, the trial court found that SSOSA evaluations were exempt from disclosure under RCW 70.02.250 and 71.05.445, granting the John Does' motion for summary judgment and issuing a permanent injunction against the DOC. The permanent injunction prevented the DOC from releasing the SSOSA evaluations of level I sex offenders.

The DOC and Zink both appealed the trial court's summary judgment ruling. Additionally, Zink appealed the trial court's order allowing the John Does to proceed in pseudonym. Division One of the Court of Appeals affirmed. It found that "[b]ecause SSOSA evaluations contain health care information, if not redacted, they are exempt from PRA disclosure under RCW 42.56.360(2) and RCW 70.02.020(1)."[2] *John Doe G v.*

---

[2] This court limited its scope of review to specifically address whether unredacted SSOSA evaluations are exempt from disclosure because they contain "health care information."

    The parties did not argue the applicability of RCW 70.02.250 in their briefing, nor did the Court of Appeals address it. However, the issue was raised at oral argument. Specifically, this provision concerns disclosure of "information and records related to mental health services," which the Uniform Health Care Information Act, chapter 70.02 RCW, defines as

        *a type of health care information* that relates to all information and records
        compiled, obtained, or maintained in the course of providing services by a mental

*Dep't of Corr.*, 197 Wn. App. 609, 623, 391 P.3d 496, *review granted*, 188 Wn.2d 1008, 394 P.3d 1009 (2017). The court found that SSOSA evaluations "directly relate to offenders' health care" because, among other things, they contain medical and mental health information, include results of physical and psychological tests, and assess amenability to treatment. *Id.* at 622-23. The court also found that pursuant to the experience and logic test, the use of pseudonyms does not implicate article 1, section 10 of the Washington Constitution. *Id.* at 627-28. The court explained that experience and logic show that "the public's interest in the plaintiffs' names is minimal and use of those names would chill their ability to seek relief." *Id.* at 628.

## ANALYSIS

### Standard of Review

We review all agency actions taken or challenged under the PRA de novo. RCW 42.56.550(3). Pursuant to the PRA, "[c]ourts shall take into account the policy . . . that free and open examination of public records is in the public interest, even though such examination may cause inconvenience or embarrassment to public officials or others." *Id.* "[W]here the record consists only of affidavits, memoranda of law, and other documentary evidence," we stand in the same position as the trial court. *Progressive*

---

health service agency or mental health professional to persons who are receiving or have received services for mental illness.

RCW 70.02.010(21) (emphasis added).

In other words, RCW 70.02.250 applies only to "health care information." Because we hold that SSOSA evaluations do not contain "health care information," it follows that they do not contain "[i]nformation and records related to mental health services." *Id.*

*Animal Welfare Soc'y v. Univ. of Wash.*, 125 Wn.2d 243, 252, 884 P.2d 592 (1994) (plurality opinion) (*PAWS* II).

A public record is virtually any record related to the government's conduct or performance. *Nissen v. Pierce County*, 183 Wn.2d 863, 874, 357 P.3d 45 (2015); RCW 42.56.010(3). Additionally, the PRA's disclosure provisions must be construed liberally and exemptions narrowly. *PAWS* II, 125 Wn.2d at 251 (citing RCW 42.17.010(11), .251, .920). To that end, "we start with the proposition that the act establishes an affirmative duty to disclose public records unless the records fall within *specific statutory exemptions*." *Spokane Police Guild v. Liquor Control Bd.*, 112 Wn.2d 30, 36, 769 P.2d 283 (1989) (emphasis added). The party attempting to avoid disclosure bears the burden of proving an exemption applies. *Ameriquest Mortg. Co. v. Office of Att'y Gen.*, 177 Wn.2d 467, 486-87, 300 P.3d 799 (2013). The legislature enacted the PRA to ensure "broad disclosure of public records." *Hearst Corp. v. Hoppe*, 90 Wn.2d 123, 127, 580 P.2d 246 (1978).

SSOSA Overview

The Washington Legislature enacted the SSOSA as part of the Sentencing Reform Act of 1981, chapter 9.94A RCW. *State v. Canfield*, 154 Wn.2d 698, 701 n.1, 116 P.3d 391 (2005) (citing RCW 9.94A.670(2)). A SSOSA is a sentencing alternative that allows a trial court to suspend a first time sex offender's felony sentence if that offender meets certain statutory criteria. *Id.* Among other things, the court must impose a term of

5

community custody and sex offender treatment as a condition to granting a SSOSA. RCW 9.94A.670(5)(b)-(c).

If eligible, an offender who requested a SSOSA must undergo an evaluation to aid the court in determining whether the offender is "amenable to treatment," and to assess the offender's "relative risk to the community." RCW 9.94A.670(3)(b). A SSOSA evaluation must, at a minimum, include

> (i) The offender's version of the facts and the official version of the facts;
> (ii) The offender's offense history;
> (iii) An assessment of problems in addition to alleged deviant behaviors;
> (iv) The offender's social and employment situation; and
> (v) Other evaluation measures used.

RCW 9.94A.670(3)(a). SSOSA evaluations must be performed by a certified sex offender treatment provider and must also include "the evaluator's diagnostic impressions." RCW 9.94A.670(1)(a), .820(1); WAC 246-930-320(2)(f)(ii). However, the certified sex offender treatment provider who completed the offender's SSOSA evaluation is prohibited from providing subsequent treatment to the offender, except in limited circumstances. RCW 9.94A.670(13).

Health Care Information

The central issue in this case is whether SSOSA evaluations are exempt from public disclosure under the PRA because they contain "health care information." According to the PRA, "health care information" under chapter 70.02 RCW, the Uniform Health Care Information Act (UHCIA), is exempt from public disclosure. RCW

42.56.360(2). The UHCIA defines "health care information" as information "that identifies or can readily be associated with the identity of a patient and directly relates to the patient's health care." RCW 70.02.010(16). Furthermore, "'[h]ealth care' means any care, service, or procedure provided by a health care provider . . . [t]o diagnose, treat, or maintain a patient's physical or mental condition." RCW 70.02.010(14)(a). Thus, the pertinent inquiry is whether a SSOSA evaluation "directly relates to [a] patient's health care." RCW 70.02.010(16). We hold that it does not.

"Directly" means "purposefully or decidedly and straight to the mark." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 641 (2002). The legislature could have defined "health care information" as any information *related* to health care. Instead, the legislature narrowed its definition to include only information *directly* related—or in other words—for the direct purpose of health care. The PRA requires a narrow reading of exemptions to disclosure. *PAWS* II, 125 Wn.2d at 251. Exempting information that is incidentally related to health care would be inconsistent with the PRA's broad disclosure policy.

A SSOSA evaluation is not directly related to health care. Its purpose is to assist the court in determining whether the offender should be granted an alternative sentence instead of jail time. *See State v. Young*, 125 Wn.2d 688, 693, 888 P.2d 142 (1995) ("The Legislature developed the special sentencing provision for first-time sex offenders in an attempt to prevent future crimes and protect society."). More specifically, a SSOSA evaluation is a forensic examination, not a medical one.

7

In *State v. Sullivan*, 60 Wn.2d 214, 223-24, 373 P.2d 474 (1962), we drew a distinction between forensic and medical examinations in the doctor-patient privilege context. We held that

> a forensic examination by a physician is not within the statutory testimonial prohibitions of the doctor-patient privilege. The reasons are: the relationship of doctor and patient does not exist; the examination is not for the purpose of treatment, but for the publication of results. . . . "[T]here is no privilege when the examination is made by the physician *for the express purpose of publishing the results*—such, for example, as testifying in an action for personal injuries."

*Id.* (emphasis added) (citations omitted) (quoting *Strafford v. N. Pac. Ry. Co.*, 95 Wash. 450, 453, 164 P. 71 (1917)). Although the facts of the current case do not concern the doctor-patient privilege, *Sullivan* stands for the proposition that forensic examinations are not subject to the same privacies and privileges as medical evaluations.

SSOSA evaluations are made for the purpose of publishing the results to the court. When a SSOSA is requested, the court orders a SSOSA evaluation and uses the evaluation to assess whether the offender should be granted an alternative sentence. RCW 9.94A.670(3)-(4). Unlike typical health care evaluations, SSOSA evaluations are made with the understanding that they will be shared with others. The offender knows that in order to avail himself of the benefit of an alternative sentence, he must undergo this evaluation for court review.

A SSOSA evaluation, unlike an ordinary health examination, focuses on the patient's health. In a SSOSA evaluation, the court must decide whether the offender is amenable to treatment and whether a SOSSA will serve public safety interests and the

8

penological goal of rehabilitation. The court uses a SSOSA evaluation to consider, among other things, community impact, whether the alternative sentence is too lenient in light of the offense, and risk to the victim. RCW 9.94A.670(4). In other words, a medical evaluation assesses treatment options in the best interest of the patient, while a SSOSA evaluation assesses treatment options in the best interest of the court, the community, the victim, and the offender.

It is also noteworthy that the treatment provider who completed the offender's SSOSA evaluation is prohibited from providing subsequent treatment to the offender, except in limited circumstances. RCW 9.94A.670(13). This indicates the legislature's intent to distinguish the forensic stage—the SSOSA evaluation—from the potentially medical stage—the SSOSA alternative itself.

The John Does dispute that a SSOSA evaluation is a forensic examination, arguing that the purpose of the evaluation is to assess the offender's "amenability to treatment," which, according to the John Does, actually means "to diagnose whether the offender's mental condition is amenable to health care." Suppl. Br. of Resp'ts at 5. In the John Does' view, SSOSA evaluations contain "health care information" because assessing "amenability to treatment" constitutes a medical determination. This is so, they argue, because the evaluator's "'diagnostic impressions'" and "'assessment of relative risk factors'" must be included in the SSOSA evaluation. *Id.* (quoting WAC 246-930-320(2)(f)(ii)-(iii)). The John Does also add that a SSOSA evaluation must include a "proposed treatment plan." RCW 9.94A.670(3)(b).

We are unpersuaded by this argument. Assessing whether an offender is "amenable to treatment," as required by the SSOSA statute, is a legal determination, not a medical one. In *State v. McNallie*, we held that

> [o]ur purpose in requiring objective evidence regarding amenability to treatment is not to provide defendants with unlimited bites at the treatment apple. Courts faced with a prior history of failed attempts at therapy are free to consider this history in deciding on the defendant's current prognosis for rehabilitation. When that prognosis is poor, based on the failure of previous treatment attempts as shown by offenses occurring during treatment or soon thereafter, exceptionally long sentences are justified in order to protect the public from a defendant who is likely to reoffend. Nevertheless, in cases where there is no such treatment history, or there has been a very long period of offense-free behavior following therapy, an exceptional sentence cannot be sustained without "the opinion of a mental health professional that the defendant would likely not be amenable to treatment."

123 Wn.2d 585, 591-92, 870 P.2d 295 (1994) (footnote and citations omitted) (quoting *State v. Pryor*, 115 Wn.2d 445, 455, 799 P.2d 244 (1990)). Amenability to treatment is not a medical determination but, rather, a threshold inquiry that the court must make before deciding to grant an alternative sentence. The John Does' argument conflates SSOSA evaluations with SSOSA sentences—the purpose of a SSOSA evaluation is the primary issue in this case, not the purpose of a SSOSA sentence. While the purpose of a SSOSA sentence is to treat sex offenders who are amenable to treatment, the purpose of a SSOSA evaluation is to determine which sex offenders are eligible for a SSOSA—i.e., amenable to treatment.

In deciding whether an offender is amenable to treatment, the sentencing court does not limit itself to medical inquiries. Rather, an offender

would not be "amenable to treatment" if the record establishes that (1) no treatment programs are available; (2) the defendant is ineligible for treatment at all available facilities due, for instance, to prior unsuccessful treatment; (3) the defendant refuses to cooperate with necessary evaluations to determine the usefulness of treatment; or (4) no facility is sufficiently secure to house the defendant during treatment.

*State v. Miller*, 60 Wn. App. 914, 919, 808 P.2d 186 (1991). A sentencing court is permitted to take any of these factors into account before deciding whether to grant a SSOSA to a specific offender. If the offender is unamenable to treatment, the court may decline to grant a SSOSA sentence, and the offender may never receive medical treatment as the result of a SSOSA evaluation. *See* RCW 9.94A.670.

Finally, while a SSOSA evaluation requires a proposed treatment plan, that alone is not sufficient to render it "health care information." The treatment plan required by the SSOSA statute is not a traditional medical treatment plan. While the treatment plan must include some proposals regarding medical treatment, it must also include "[r]ecommendations for specific behavioral prohibitions, requirements and restrictions on living conditions, lifestyle requirements, and monitoring by family members and others that are necessary to the treatment process and community safety." WAC 246-930-320(2)(g)(iii).

We conclude that SSOSA evaluations are forensic examinations made for the purpose of aiding a court in sentencing a sex offender. Accordingly, we hold that

11

SSOSA evaluations are not exempt from PRA disclosure, as they do not contain "health care information," nor do they fall within any other specific exemption.[3]

Pseudonyms

The second issue is this case is whether the John Does should have been allowed to proceed in pseudonym. Zink argues that the trial court failed to follow GR 15 and the five-step framework required by *Seattle Times Co. v. Ishikawa*, 97 Wn.2d 30, 37-39, 640 P.2d 716 (1982), before allowing the John Does to proceed in pseudonym and, thus, erred in granting the John Does' motion.

In affirming the trial court, the Court of Appeals relied on federal appellate court decisions to create a new test for assessing the appropriateness of pseudonymity. The Court of Appeals explained:

> Although federal law lacks a provision like Washington's article I, section 10, federal courts recognize parallel rights under the First Amendment. We therefore look to those courts for guidance. The Eleventh Circuit has explained that pseudonyms are appropriate where "the injury litigated against would be incurred as a result of the disclosure of the plaintiff's identity." To this end, federal courts have adopted balancing tests: the Eleventh, Tenth, and Fifth Circuits allow a plaintiff to proceed pseudonymously where "the plaintiff has a substantial privacy right which outweighs the customary and constitutionally-embedded presumption of openness in judicial proceedings." The Ninth and Second Circuits ask whether "the party's need for anonymity outweighs prejudice to the opposing party and the public's interest in knowing the party's identity."

*John Doe G*, 197 Wn. App. at 627 (footnotes and internal quotation marks omitted)

(quoting *Bill W. Doe v. Frank*, 951 F.2d 320, 324 (11th Cir. 1992); *Jane Roe II v. Aware*

---

[3] As noted earlier, our holding is based on our understanding of the statutory purpose and "ingredients" of a SSOSA evaluation, not on an actual evaluation.

12

*Woman Ctr. for Choice, Inc.*, 253 F.3d 678, 685 (11th Cir. 2001); *Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1068 (9th Cir. 2000)). We have never used this analysis to determine whether pseudonymous litigation is appropriate. Rather, we rely on GR 15 and *Ishikawa*. Under GR 15, a court record may be sealed if a court "'enters written findings that the specific sealing or redaction is justified by identified compelling privacy or safety concerns that outweigh the public interest in access to the court record.'" *Hundtofte v. Encarnación*, 181 Wn.2d 1, 7, 330 P.3d 168 (2014) (plurality opinion) (quoting GR 15(c)(2)). Moreover, *Ishikawa* requires the court to (1) identify the need to seal court records, (2) allow anyone present in the courtroom an opportunity to object, (3) determine whether the requested method is the least restrictive means of protecting the interests threatened, (4) weigh the competing interests and consider alternative methods, and (5) issue an order no broader than necessary. 97 Wn.2d at 37-39.

"Whether an *Ishikawa* analysis is necessary depends on whether article I, section 10 applies." *State v. S.J.C.*, 183 Wn.2d 408, 412, 352 P.3d 749 (2015). Article I, section 10 of the constitution requires that "[j]ustice in all cases shall be administered openly, and without unnecessary delay." WASH. CONST. art. I, § 10. Moreover, "[w]hether article I, section 10 applies depends on application of the experience and logic test." *S.J.C.*, 183 Wn.2d at 412.

To determine whether article I, section 10 is implicated, we must examine whether experience and logic support the John Does' desire to proceed in pseudonym. The

experience prong examines "'whether the place and process have historically been open to the press and general public.'" *Id.* at 417 (internal quotation marks omitted) (quoting *In re Det. of Morgan*, 180 Wn.2d 312, 325, 330 P.3d 774 (2014)). The logic prong examines "'whether public access plays a significant positive role in the functioning of the particular process in question.'" *Id.* at 430 (internal quotation marks omitted) (quoting *Morgan*, 180 Wn.2d at 325).

First, under the experience prong, the names of people convicted of criminal offenses, including sex offenders, have historically been open to the public. Indeed, the names of all convicted felons have historically been open to the public because Washington requires that "[c]onviction records . . . be disseminated without restriction." RCW 10.97.050.

While Washington courts have allowed pseudonymous litigation, in some circumstances this court has still required a showing that pseudonymity was necessary. *See Ishikawa*, 97 Wn.2d at 37 ("If closure and/or sealing is sought to further any right or interest besides the defendant's right to a fair trial, a 'serious and imminent threat to some other important interest' must be shown."). None of the cases relied on by the Court of Appeals allowing parties to proceed in pseudonym involved parties whose names and association to their respective crimes were already public record.[4] Unlike convicted sex

---

[4] *John Doe v. Grp. Health Coop. of Puget Sound, Inc.*, 85 Wn. App. 213, 932 P.2d 178 (1997) (employee brought UHCIA and invasion of privacy claims over health care provider's disclosure of name and consumer numbering in training exercise on processing mental health claims); *Jane Doe v. Boeing Co.*, 64 Wn. App. 235, 823 P.2d 1159 (1992) (transgender employee sued employer for disability discrimination), *rev'd*, 121 Wn.2d 8, 846 P.2d 531 (1993); *John Doe v. Spokane*

offenders, parties who have not been convicted of any crime may have a legitimate privacy interest because there is no public record associating them with the subject of their litigation. Moreover, by participating in this case, the John Does are not subject to any disclosures that should otherwise be exempt. All that is revealed by the caption and the facts of the case are their names and that they have been given a SSOSA—both of which are public record. The specific details of the John Does' SSOSA evaluations, which we hold are subject to disclosure, are not even discussed in this case.

Logic also suggests that the John Does do not have a legitimate privacy interest to protect in this case. Because the SSOSA is a sentencing alternative, the public "'plays a significant positive role in the functioning of the particular process in question.'" *S.J.C.*, 183 Wn.2d at 430 (internal quotation marks omitted) (quoting *Morgan*, 180 Wn.2d at 325). For example, open courts encourage accountability by the court and the parties before them. *See Dreiling v. Jain*, 151 Wn.2d 900, 903, 93 P.3d 861 (2004) ("Justice must be conducted openly to foster the public's understanding and trust in our judicial system and to give judges the check of public scrutiny."). Here, the public's involvement plays a significant role. The public must be able to scrutinize the sentences given to

---

*& Inland Empire Blood Bank*, 55 Wn. App. 106, 780 P.2d 853 (1989) (plaintiffs with AIDS (acquired immune deficiency syndrome) brought class action suit against producers and distributors of blood products); *Jane Doe v. Fife Mun. Court*, 74 Wn. App. 444, 874 P.2d 182 (1994) (class of plaintiffs [charged with] alcohol-related offenses sought to recover court costs); *John Doe v. Dep't of Transp.*, 85 Wn. App. 143, 931 P.2d 196 (1997) (sexual harassment suit by ferry worker); *Jane Doe v. Corp. of President of Church of Jesus Christ of Latter-Day Saints*, 141 Wn. App. 407, 167 P.3d 1193 (2007) (plaintiffs sued stepfather and church over alleged sexual abuse by stepfather).
*John Doe G*, 197 Wn. App. at 625 n.56.

15

offenders to ensure the court is following the sentencing statutes, is not overly deferential in granting SSOSA sentences, or is denying SSOSA sentences where warranted. We hold that names in pleadings are subject to article I, section 10 and redaction must meet the *Ishikawa* factors.

In *State v. Bone-Club*, 128 Wn.2d 254, 906 P.2d 325 (1995), this court held that a public trial closure motion triggered the court's duty to assess the five factors set forth in *Ishikawa*.[5] Additionally, the court held that without

> a trial court record showing any consideration of Defendant's public trial right, we cannot determine whether closure was warranted. We hold the trial court's failure to follow the five-step closure test enunciated in this court's section 10 cases violated Defendant's right to a public trial under section 22.

*Id.* at 261. Consequently, prejudice is presumed when the constitutional right to open courts is violated. *Id.* at 261-62. Here, the trial court granted the John Does' motion to proceed in pseudonym without the required consideration on the record.[6]

*Ishikawa* requires that the court allow anyone present in the courtroom an opportunity to object. 97 Wn.2d at 38; *see Bone-Club*, 128 Wn.2d at 261 (where "summary closure thus deprived Defendant of a meaningful opportunity to object"). Moreover, the *Ishikawa* factors "should be articulated in [the court's] findings and

---

[5] Although *Bone-Club* discussed proper procedures for courtroom closure under article I, section 22 of the Washington Constitution, the court held that the same standards apply to both section 22 and section 10. 128 Wn.2d at 259.

[6] While the court did not consider the pseudonym issue on the record, it claimed that it considered the *Bone-Club* and *Ishikawa* factors in its order.[6] Report of Proceedings (Oct. 3, 2014) at 22 ("[I]n my order, I did indicate some findings that balanced the public interest in knowing their names against the Plaintiffs' interest in privacy. And so the Court has conducted that balance and the order reflects that.").

conclusions, which should be as specific as possible rather than conclusory." *Ishikawa*, 97 Wn. 2d. at 38. Here, the court's order was conclusory—simply finding that Zink would not be prejudiced if the John Does were allowed to proceed in pseudonym and that the John Does' real names have little bearing on the public's interest in this case. CP at 327.

Because the trial court did not justify its actions under GR 15 and *Ishikawa*, we reverse its order permitting pseudonymity.

## CONCLUSION

We reverse the Court of Appeals and hold that SSOSA evaluations are not exempt under the PRA because they do not contain "health care information." We further hold that names in captions implicate article I, section 10, and that the trial court erred in granting the John Does' motion to proceed in pseudonym because the trial court failed to apply GR 15 and the *Ishikawa* factors.

No. 94203-0

_Madsen, J._

WE CONCUR:

_Fairhurst, C.J._

_Johnson, J._

_Owens, J._

_Stephens, J._   _Yu, J._

No. 94203-0

GONZÁLEZ, J. (concurring)—I agree with the majority's resolution of the questions before us. I write separately simply to explain why Justice Wiggins's dissenting view that the plaintiffs may proceed with pseudonyms is in direct conflict with *Hundtofte v. Encarnación*, 181 Wn.2d 1, 330 P.3d 168 (2014) (plurality opinion). In that case, defendants of a dismissed unlawful detainer action sought to have their misleading court record redacted because it prevented them from obtaining housing and they reasonably feared homelessness. *Id.* at 21 (González, J., dissenting).

A majority of the court (including Justice Wiggins) held that removing barriers to finding rental housing was not a sufficiently compelling reason to justify obscuring full names from a court record. *Id.* at 9 (lead opinion of Owens, J.), 17 (Madsen, C.J., concurring) ("The trial court's ruling is contrary to the plain meaning of GR 15 because it allows a change to court records under a theory of redaction that is not permitted even under the more restrictive sealing provisions of

1

GR 15."). The *Encarnación* majority made its decision, despite the trial court's factual conclusions and consideration of the *Ishikawa*[1] factors. *See, e.g., id.* at 5 ("The court found that [being named in unlawful detainers] posed a serious and imminent threat to Encarnación and Farías' compelling interest in obtaining future rental housing.").

I made my disagreement with the result in *Encarnación* clear. *See id.* at 18 (González, J., dissenting). Given the fact that *Encarnación* is now the rule, the dissent should reconsider its position that the sex offenders' privacy interest outweighs the public's interest in knowing their names. The dissent cannot have it both ways. Unless a party is able to show a serious and imminent threat to its privacy interest, that privacy interest does not outweigh the public's interest in the open administration of justice. *Id.* at 10 (lead opinion).

The majority's view is consistent with *Encarnación*. Majority at 12. Here, the dissent cites the trial court's written findings, the plaintiffs' legitimate expectation of privacy, and the fact that full names are unnecessary to scrutinize the sentences given to the plaintiffs. But the dissent cannot show that the case for pseudonyms in *John Does* is more compelling than the case for redaction in *Encarnación*, especially since the plaintiffs' convictions are matters of public record. I therefore concur.

---

[1] *Seattle Times Co. v. Ishikawa*, 97 Wn.2d 30, 37-39, 640 P.2d 716 (1982).

González, J.

3

No. 94203-0

WIGGINS, J. (dissenting)—Special sex offender sentencing alternative (SSOSA) evaluations contain "health care information" and that information is exempt from disclosure under the Public Records Act (PRA), chapter 42.56 RCW. In addition, the trial court did not err by allowing John Does G, I, and J (John Does) to proceed in pseudonym. For these reasons, I cannot join the majority's opinion and respectfully dissent.

I.    The PRA exempts health care information from disclosure

"The primary purpose of the PRA is to provide broad access to public records to ensure government accountability." *City of Lakewood v. Koenig*, 182 Wn.2d 87, 93, 343 P.3d 335 (2014). An agency must disclose responsive public records "unless the record falls within the specific exemptions of [the PRA] . . . or other statute." RCW 42.56.070(1). "Consistent with its purpose of disclosure, the PRA directs that its exemptions must be narrowly construed." *Koenig*, 182 Wn.2d at 94; *see also* RCW 42.56.030.

Relevant here, the PRA exempts "health care information" under chapter 70.02 RCW from disclosure. RCW 42.56.360(2) ("Chapter 70.02 RCW applies to public inspection and copying of health care information of patients."). Thus, any health care

information that is not available under chapter 70.02 RCW is not subject to disclosure under the PRA.

Chapter 70.02 RCW, commonly referred to as the Uniform Health Care Information Act (UHCIA), governs the release of health care information in various circumstances. At the time of the statute's passage, the legislature made several findings about the importance of protecting the privacy of health care information:

> The legislature finds that:
> (1) Health care information is personal and sensitive information that if improperly used or released may do significant harm to a patient's interests in privacy, health care, or other interests.
>
>     . . . .
>
> (3) In order to retain the full trust and confidence of patients, health care providers have an interest in assuring that health care information is not improperly disclosed and in having clear and certain rules for the disclosure of health care information.
> (4) Persons other than health care providers obtain, use, and disclose health record information in many different contexts and for many different purposes. It is the public policy of this state that a patient's interest in the proper use and disclosure of the patient's health care information survives even when the information is held by persons other than health care providers.

RCW 70.02.005. Thus, unlike the PRA, the UHCIA carries a general presumption of nondisclosure without a patient's written authorization. *See, e.g.*, RCW 70.02.020(1) ("Except as authorized elsewhere in this chapter, a health care provider, an individual who assists a health care provider in the delivery of health care, or an agent and employee of a health care provider may not disclose health care information about a patient to any other person without the patient's written authorization.").

"Health care information" is "any information, whether oral or recorded in any form or medium, that identifies or can readily be associated with the identity of a patient

2

and directly relates to the patient's health care." RCW 70.02.010(16). "Health care" is "any care, service, or procedure provided by a health care provider: (a) To diagnose, treat, or maintain a patient's physical or mental condition; or (b) That affects the structure or any function of the human body." RCW 70.02.010(14).

### A. SSOSA evaluations contain information that is directly related to a patient's health care.

Here, the majority concludes that there is no health care information in a SSOSA evaluation. Majority at 1. Specifically, the majority concludes that SSOSA evaluations are not "'directly relate[d] to [a] patient's health care.'" Majority at 7 (quoting RCW 70.02.010(16)) (second alteration in original). However, SSOSA evaluations contain a wealth of information that directly relates to an individual's health care.

A SSOSA is a special sentencing alternative that suspends the sentences of qualifying sex offenders. RCW 9.94A.670. Before the court orders a SSOSA, a certified sex offender treatment provider evaluates "whether the offender is amenable to treatment." RCW 9.94A.670(3). Generally, the SSOSA evaluation is performed by the Department of Health (DOH). RCW 9.94A.670(1)(a); RCW 18.155.020.

The majority concludes that SOSSA evaluations do not "'directly relate[ ] to [the] patient's health care'" because a SSOSA evaluation's "purpose is to assist the court in determining whether the offender should be granted an alternative sentence instead of jail time."[1] Majority at 7 (quoting RCW 70.02.010(16)). In so concluding, the majority

---

[1] The majority also considers it "noteworthy that the treatment provider who completed the offender's SSOSA evaluation is prohibited from providing subsequent treatment to the offender, except in limited circumstances." Majority at 9 (citing RCW 9.94A.670(13)). The majority concludes

3

injects into the definition of "health care information" a requirement that does not exist: that information "'directly relates to the patient's health care'" only if it is solely "for the direct purpose of health care." *Id.* (quoting RCW 70.02.010(16)). While assisting a court in its sentencing determination is undoubtedly the purpose of a SSOSA evaluation, this does not mean that the information in a SSOSA evaluation is not directly related to a patient's health care. In other words, a SSOSA evaluation can still be directly related to a patient's health care despite its use to aid a court in a sentencing decision.

Nothing in the PRA or UHCIA limits health care information to information that is used *solely* for the purpose of obtaining health care. *Cf. id.* Rather, the information must be "directly relate[d]" to an individual's health care. RCW 70.02.010(16). "Directly" means "purposefully or decidedly and straight to the mark," "plainly and not by implication," or "in unmistakable terms." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 641 (2002). And to "relate" means to have a "logical or causal connection." *Id.* at 1916. Evaluating the content within a SSOSA evaluation, in addition to its purpose, reveals that SSOSA evaluations contain information directly related to an offender's past, current, and future health care. Accordingly, this information is exempt from disclosure under the PRA.

---

that this demonstrates that the legislature intended to separate the medical and forensic stages of a SSOSA. *Id.* However, the text of RCW 9.94A.670(13) clearly indicates the legislature's actual concern was the possible financial abuse of a system where an evaluator could diagnose and then treat a patient: "The offender's sex offender treatment provider may not be the same person who examined the offender under subsection (3) of this section or *any person who employs, is employed by, or shares profits* with the person who examined the offender under subsection (3) of this section . . . ." (Emphasis added.) In addition, the trial court cannot order a SSOSA without the opinion of a medical professional on the offender's amenability to treatment. *State v. Strauss*, 119 Wn.2d 401, 421, 832 P.2d 78 (1992) (stating that "a mental health care professional's opinion *is necessary* to determine a defendant's amenability to treatment" (emphasis added)).

4

The DOH requires its evaluators to include a substantial amount of information regarding the offender's current and historical mental, physical, and sexual health in a SSOSA evaluation, including previous medical assessments; "[s]ubstance abuse"; [p]sychological/physiological tests"; "[a] sexual history, sexual offense history and patterns of sexual arousal/preference/interest"; "[p]rior treatment"; "[a]lcohol and drug abuse"; "[s]tress"; "[m]ood"; "[s]exual patterns"; "[p]ersonal history including: [ ] [m]edical"; "[m]ental health functioning including coping abilities, adaptation style, intellectual functioning and personality attributes"; "[t]he overall findings of psychological/physiological/medical assessment if these assessments have been conducted"; "[t]he evaluator's conclusions regarding the appropriateness of community treatment"; "[a] summary of the evaluator's diagnostic impressions"; "[a] proposed treatment plan"; "[a]nticipated length of treatment, frequency and type of contact with providers or affiliates, and supplemental or adjunctive treatment"; "[t]he specific issues to be addressed in treatment and a description of planned treatment interventions including involvement of significant others in treatment and ancillary treatment activities"; and "[r]ecommendations for specific behavioral prohibitions, requirements and restrictions on living conditions, lifestyle requirements, and monitoring by family members and others that are necessary to the treatment process and community safety." WAC 246-930-320.

Additionally, the SSOSA evaluation must include a personalized mental and sexual health treatment plan that addresses and responds to the particular offender's issues by outlining a plan for future health care:

5

(b) The examiner shall assess and report regarding the offender's amenability to treatment and relative risk to the community. A proposed treatment plan shall be provided and shall include, at a minimum:

(i) Frequency and type of contact between offender and therapist;

(ii) Specific issues to be addressed in the treatment and description of planned treatment modalities;

(iii) Monitoring plans, including any requirements regarding living conditions, lifestyle requirements, and monitoring by family members and others;

(iv) Anticipated length of treatment; and

(v) Recommended crime-related prohibitions and affirmative conditions, which must include, to the extent known, an identification of specific activities or behaviors that are precursors to the offender's offense cycle, including, but not limited to, activities or behaviors such as viewing or listening to pornography or use of alcohol or controlled substances.

RCW 9.94A.670(3).

Here, SSOSA evaluations contain information that plainly and unmistakably has a direct connection to an offender's past, current, and future health care. For example, the evaluator's findings of an offender's "prior treatment," and "personal medical history" are a record of the offender's past "care, service, or procedure provided by a health care provider" to "treat[ ] or maintain a patient's physical or mental condition." RCW 70.02.010(14), (14)(a). The "proposed treatment plan" is an outline of the offender's needed "care . . . provided by a health care provider . . . to treat[ ] or maintain [the offender's] physical or mental condition." RCW 9.94A.670(3)(b); RCW 70.02.010(14). And, the findings of "psychological/physiological/mental assessment[s]," "the evaluator's diagnostic impressions," "[s]ubstance abuse," "[p]sychological/physiological tests," and "[m]ental health functioning," are undoubtedly used "by a health care provider" to "diagnose . . . a patient's physical or mental condition." WAC 246-930-320; RCW 70.02.010(14).

The court's additional use of this information in sentencing does not disassociate the information from the offender's health care. Its diagnostic and treatment purposes remain. Because the SSOSA evaluation includes information directly related to a patient's health care, it is exempt from disclosure under the PRA. RCW 42.56.360(2).

*B. Forensic examinations may contain health care information*

The majority also concludes that SSOSA evaluations do not contain health care information because they are "forensic examination[s]" rather than medical examinations. Majority at 7. Even assuming SSOSA evaluations are forensic examinations, they still may and do contain health care information. Consequently, they are exempt from disclosure under the PRA.

In reaching its conclusion that forensic examinations do not contain health care information, the majority relies on *State v. Sullivan*, 60 Wn.2d 214, 373 P.2d 474 (1962). Majority at 8. In *Sullivan*, this court had to determine whether a doctor who observed and treated a defendant pursuant to a court order was subject to the doctor-patient privilege. 60 Wn.2d at 226. In reaching its conclusion, the court opined that "'when the examination is made by the physician for the express purpose of publishing the results,'" otherwise known as a "forensic examination," there is no doctor-patient privilege. *Id.* at 224 (quoting *Strafford v. N. Pac. Ry. Co.*, 95 Wash. 450, 453, 164 P. 71 (1917)). Relying on this language, the majority concludes that because "SSOSA evaluations are made for the purpose of publishing the results to the court," SSOSA

evaluations "are not subject to the same privacies and privileges[2] as medical evaluations." Majority at 8.

Whether SSOSA evaluations are "published" to the court, does not determine whether they are subject to disclosure under the PRA. *Cf. id.* When regulating the disclosure of health care information, the legislature recognized that circumstances exist where entities other than health care providers use health care information for purposes other than treatment; however, the legislature made clear that even in those circumstances, individuals retain a privacy interest in their health care information:

> Persons other than health care providers obtain, use, and disclose health record information in many different contexts and for many different purposes. It is the public policy of this state that *a patient's interest in the proper use and disclosure of the patient's health care information survives even when the information is held by persons other than health care providers.*

RCW 70.02.005(4) (emphasis added). As a result, we cannot rely on the fact that SSOSA evaluations are published to the court to determine whether the health care information is subject to public disclosure under the PRA.

Instead, we must rely on the definition of health care information to determine whether SSOSA evaluations contain any information that is protected from disclosure.

---

[2] Whether a doctor-patient privilege exists has no bearing on the relevant inquiry of whether SSOSA evaluations contain information directly related to a patient's health care. Neither the PRA nor the UHCIA requires the existence of a doctor-patient privilege to protect health care information from disclosure. In fact, the statutes do not even require that the health care information be between a doctor and patient in order for that information to be protected. RCW 70.02.020 ("[A] health care provider, an individual who assists a health care provider in the delivery of health care, or an agent and employee of a health care provider may not disclose health care information about a patient to any other person without the patient's written authorization."). Consequently, the evaluations are exempt from disclosure under the PRA, even if they do not possess the traditional doctor-patient privilege of medical examinations.

8

Any information that is directly related to the diagnosis, treatment, or maintenance of "a patient's physical or mental condition" qualifies as health care information. RCW 70.02.010(14)(a), (16). As discussed above, SSOSA evaluations contain such information. Therefore, the health care information in SSOSA evaluations is exempt from disclosure under the PRA.

### C. *Amenability to treatment is a legal determination that necessarily includes health care information*

Finally, the majority concludes that SSOSA evaluations do not contain health care information because an offender's amenability to treatment is a legal determination rather than a medical determination. Majority at 10. To reach this conclusion, the majority again ignores the substance of a SSOSA evaluation, which requires the opinion of a health care provider regarding the defendant's medical receptiveness to treatment. That information is directly related to an offender's health care and thus qualifies as health care information.

Courts are not limited to health care information when deciding whether an offender is amenable to treatment. *See, e.g.,* RCW 9.94A.670(4) ("The court shall give great weight to the victim's opinion whether the offender should receive a treatment disposition under this section."). However, "a mental health care professional's opinion *is necessary* to determine a defendant's amenability to treatment." *Strauss,* 119 Wn.2d at 421 (emphasis added); *see also State v. McNallie,* 123 Wn. 2d 585, 592, 870 P.2d 295 (1994) (concluding that "an exceptional sentence cannot be sustained without 'the opinion of a mental health professional that the defendant would likely not be amenable to treatment'" (quoting *State v. Pryor,* 115 Wn.2d 445, 455, 799 P.2d 244 (1990)). Thus,

9

the court's determination of amenability to treatment inevitably contains information directly related to an offender's health care—the opinions, diagnoses, and recommendations of a medical professional regarding the offender's treatment. Consequently, the fact that the court's determination of the offender's amenability to treatment involves consideration of nonmedical information does not negate the presence of the health care information that the determination requires.

II.    Plaintiffs may proceed under pseudonyms

I also disagree with the majority's conclusion that the trial court erred by allowing the John Does to proceed in pseudonym for two reasons. First, the trial court appropriately justified its actions under GR 15. Second, article I, section 10 of the Washington State Constitution does not apply and the trial court was not required to consider the *Ishikawa*[3] factors. As a result, the trial court's order permitting the John Does to proceed in pseudonym was not in error.

*A. The trial court justified its order with written findings pursuant to GR 15*

A court may order that a record be sealed when it "makes and enters written findings that the specific sealing or redaction is justified by identified compelling privacy or safety concerns that outweigh the public interest in access to the court record." GR 15(c)(2). When identifying compelling privacy concerns justifying sealing or redaction, this court has noted that "a plaintiff may proceed under a pseudonym to protect a

---

[3] *Seattle Times Co. v. Ishikawa*, 97 Wn.2d 30, 640 P.2d 716 (1982).

10

privacy interest."[4] *N. Am. Council on Adoptable Children v. Dep't of Soc. and Health Servs.*, 108 Wn.2d 433, 440, 739 P.2d 677 (1987).

Here, the trial court identified multiple privacy and safety concerns in a written order, which justified the use of pseudonyms:

> 22. Disclosing the requested SSOSA evaluations maintained by the DOC [Department of Corrections] would not be in the public interest because it would harm victims, discourage sex offenders from seeking and receiving SSOSA evaluations, discourage those offenders who do receive SSOSA evaluations from being candid with their evaluator, make it more difficult for Level I sex offenders to reintegrate, and disclose sensitive health care information.
>
> 23. Disclosure of the requested SSOSA evaluations would substantially injure public safety by undermining the SSOSA system and discouraging reintegration of Level I sex offenders. Individuals who receive SSOSA treatment have the lowest recidivism rates for any type of crime, including sex offenses.
>
> 24. Disclosure of the requested SSOSA evaluations would substantially injure Plaintiffs by reducing their housing and employment opportunities and by creating the risk that their evaluations could be accessed in a centralized location. Ms. Zink has already posted SSOSA evaluations on a public website.
>
> 25. Disclosure of the requested SSOSA evaluations would irreparably harm both Plaintiffs and Plaintiffs' victims because such disclosure could not be undone.

---

[4] Even assuming that the John Does have a lessened privacy interest because they have been convicted of criminal offenses, their convictions do not subject them to unauthorized disclosures of health care information. *Cf.* majority at 14-15. The majority points to no authority to support its contention that "convicted sex offenders" do not have "a legitimate privacy interest to protect in this case." *Id.* To the contrary, the legislature has recognized the overriding public interest of the State in protecting all health care information from unauthorized disclosure: "Health care information is personal and sensitive information that if improperly used or released may do significant harm to a patient's interests in privacy, health care, or other interests"; "[i]t is the public policy of this state that a patient's interest in the proper use and disclosure of the patient's health care information survives even when the information is held by persons other than health care providers." RCW 70.02.005(1), (4). The John Does' criminal status does not alter the definition of health care information or its accompanying protections.

Clerk's Papers at 737-38. The trial court weighed these concerns with the public's interest in knowing the names of parties: "[I]n my order, I did indicate some findings that balanced the public interest in knowing their names against the Plaintiffs' interest in privacy. And so the Court has conducted that balance and the order reflects that." Report of Proceedings (RP) (Oct. 3, 2014) at 22.

The majority does not even acknowledge these findings by the trial court, inexplicably concluding that "the trial court did not justify its actions under GR 15." Majority at 16. Yet, as stated above, under GR 15, the trial court need only "make[ ] and enter[ ] written findings that the specific sealing or redaction is justified by identified compelling privacy or safety concerns that outweigh the public interest in access to the court record." GR 15(c)(2). The trial court clearly did so in this case. As a result, it appropriately justified its actions under GR 15 and did not err in ruling that the John Does could proceed in pseudonym.

The concurring opinion contends that *Hundtofte v. Encarnación*[5] controls the outcome of this case. Concurrence at 1. I disagree for two reasons. First, there is no majority opinion in *Hundtofte*. Then-Chief Justice Madsen concurred in result in the four-justice lead opinion but on different grounds—that GR 15 does not authorize changing the caption of a case in the court index by substituting initials for full names. *Hundtofte*, 181 Wn.2d at 16; *see In re Pers. Restraint of Francis*, 170 Wn.2d 517, 532 n.7, 242 P.3d 866 (2010) ("When there is no majority opinion, the holding is the narrowest ground upon which a majority agreed."). As a result, even if we assume that

---

[5] 181 Wn.2d 1, 16, 330 P.3d 168 (2014).

*Hundtofte* applies, the concurrence is mistaken that *Hundtofte* controls the issue before us.

The second reason that *Hundtofte* does not control here is that *Hundtofte* dealt with a different issue: whether a trial court could order that court records, including the court docket, could be changed to remove the names of parties. 181 Wn.2d at 17 (Madsen, C.J., concurring). In contrast, here no court records must be changed. Instead, we must determine whether the John Does could use pseudonyms. Given the differences in the relevant issues, *Hundtofte* is easily distinguishable and inapposite. For example, the trial court in *Hundtofte* failed to follow the requirements of GR 15. *Id.* at 18 (Madsen, C.J., concurring). But here, the trial court complied with GR 15. For these reasons, *Hundtofte* does not control and this dissent is "not in direct conflict" with that opinion. Concurrence at 1.

> B. *Article I, section 10 does not apply here because experience and logic allow the use of pseudonyms when privacy and safety concerns outweigh the public interest*

The majority further concludes that the trial court erred by not conducting a proper *Ishikawa* analysis. Majority at 17. "Whether an *Ishikawa* analysis is necessary depends on whether article I, section 10 applies." *State v. S.J.C.*, 183 Wn.2d 408, 412, 352 P.3d 749 (2015). And "[w]hether article I, section 10 applies depends on application of the experience and logic test." *Id.* Under the experience prong, we consider "'whether the place and process have historically been open to the press and general public.'" *Id.* at 417 (internal quotation marks omitted) (quoting *In re Det. of Morgan*, 180 Wn.2d 312, 325, 330 P.3d 774 (2014)). Under the logic prong, we consider "'whether public access

13

plays a significant positive role in the functioning of the particular process in question.'"

*Id.* at 430 (internal quotation marks omitted) (quoting *Morgan*, 180 Wn.2d at 325).

Here, experience shows that the names of plaintiffs historically have not been

open to the public when privacy and safety concerns outweigh the public interest.[6] *See,*

*e.g., Jane Doe v. Boeing Co.*, 121 Wn.2d 8, 846 P.2d 531 (1993) (employee used a

pseudonym to bring an action against former employer for handicap discrimination);

*John Doe v. Grp. Health Coop. of Puget Sound, Inc.*, 85 Wn. App. 213, 932 P.2d 178

(1997), *overruled on other grounds by Reid v. Pierce County*, 136 Wn.2d 195, 961 P.2d

333 (1998) (using a pseudonym, an employee sued health care provider for the

unauthorized disclosure of health care information). The majority dismisses other cases

where plaintiffs used pseudonyms because it reasons that the parties in those cases

"ha[d] not been convicted of any crime [and] may have a legitimate privacy interest."

Majority at 14. Again, the majority mistakenly relies on its incorrect assumption that as

convicted offenders, the John Does do not and cannot have a legitimate privacy interest

in the health care information contained in their SSOSA evaluations. As discussed

above, this premise is false. All patients have a legitimate privacy interest in preventing

the unauthorized disclosure of their health care information; that privacy interest is not

contingent on whether a patient is a convicted offender or not. *See* RCW 70.02.005

---

[6] The majority mistakenly frames the issue as whether "the names of people convicted of criminal offenses, including sex offenders, have historically been open to the public." Majority at 14. The names of the John Does, as well as their convictions, are already open to the public. The question here is whether sufficient privacy and safety concerns outweigh the public's interest in knowing the names of convicted offenders trying to prevent the unauthorized disclosure of their health care information. *See* GR 15(c)(2). As discussed above, the trial court concluded that there were sufficient privacy and safety concerns that outweighed the public interest in this case to justify the use of pseudonyms.

14

(emphasizing the importance of protecting health care information and making no mention of the criminal status of the patient).

In addition, logic supports the John Does' use of pseudonyms in this case. When privacy and safety concerns outweigh the public's interest, allowing the use of pseudonyms permits plaintiffs to seek relief while still protecting their privacy and ensuring safety. *See, e.g., State v. Ward*, 123 Wn.2d 488, 494 n.2, 869 P.2d 1062 (1994) ("Appellant brought this action under a pseudonym, claiming that public disclosure of his true name would effectively deprive him of the relief sought."); *N. Am. Council on Adoptable Children*, 108 Wn.2d at 440 (stating that "a plaintiff may proceed under a pseudonym to protect a privacy interest"). The public does not require the John Does' real names to fulfill its important role to "scrutinize the sentences given to offenders" or to "ensure the court is following the sentencing statutes, is not overly deferential in granting SSOSA sentences, or is denying SSOSA sentences where warranted." Majority at 15-16.

In reaching a contrary conclusion, the majority ignores the numerous other sources of SSOSA-related information that are subject to public disclosure. The trial court does not limit itself to health care information when evaluating whether an offender qualifies for a SSOSA sentence:

> [T]he court shall consider whether the offender and the community will benefit from use of this alternative, consider whether the alternative is too lenient in light of the extent and circumstances of the offense, consider whether the offender has victims in addition to the victim of the offense, consider whether the offender is amenable to treatment, consider the risk the offender would present to the community, to the victim, or to persons of similar age and circumstances as the victim, and consider the victim's

15

opinion whether the offender should receive a treatment disposition under this section.

RCW 9.94A.670(4). Absent another applicable exemption, the non-health care information in a SSOSA evaluation used by the court to sentence an offender, like the risk of the offender to the community or the offender's past similar offenses, is open to public scrutiny. Actual SSOSA sentences are also available to the public for examination, as are the court's reasons for imposing a SSOSA, which must be entered in writing. RCW 9.94A.670(4) (stating that the court must "enter written findings stating its reasons for imposing the treatment disposition"). The public has several sources of available information to it; it does not also require the John Does' real names to fulfill its important role.

Because both experience and logic allow plaintiffs to use pseudonyms when privacy and safety concerns outweigh the public's interest, article I, section 10 does not apply. As a result, the trial court was not required to perform an *Ishikawa* analysis.[7]

## CONCLUSION

SSOSA evaluations contain health care information and that information is exempt from disclosure under the PRA. RCW 42.56.360(2). In addition, the trial court did not run afoul of GR 15 or article I, section 10 when it permitted the John Does to proceed in pseudonym. I would affirm the Court of Appeals. As a result, I respectfully dissent.

---

[7] Even though it was not required, the trial court indicated that it did consider the *Ishikawa* factors when it made its ruling that granted the John Does' request to use pseudonyms. RP (Oct. 3, 2014) at 22 ("I did consider the *Ishikawa* and *Bone-Club* factors. . . I'm sort of by analogy determining that it's appropriate for the Court to consider the open courts and public access to information cases in determining the ability to go forward with the John Doe G, H, and J pseudonyms.").

16

_Wiggins, J._

_George M. Cad, J._